1  SOLOMON WOLLACK (Cal. Bar No. 170003)
   Attorney at Law
2  P.O. Box 23316
   Pleasant Hill, CA 94523
3  (925) 671-2501

4  Specially Appearing for Petitioner
   Bobby Antoine McKenzie

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BOBBY ANTOINE MCKENZIE,                )   NO. C_____
                                       )
        Petitioner,                    )
                                       )
    vs.                                )
                                       )
LYDIA C. HENSE, Warden                 )
of Kern Valley State Prison, Solano, at)
Delano, California.                    )
                                       )
        Respondent.                    )
_____)


VERIFIED PETITION FOR WRIT OF HABEAS CORPUS

(18 U.S.C. § 2254)

ORIGINAL

SOLOMON WOLLACK (Cal. Bar No. 170003)
Attorney at Law
P.O. Box 23316
Pleasant Hill, CA 94523
(925) 671-2501

Specially Appearing for Petitioner
Bobby Antoine McKenzie

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BOBBY ANTOINE MCKENZIE,<br><br>Petitioner,<br><br>vs.<br><br>LYDIA C. HENSE, Warden of Kern Valley State Prison, Solano, at Delano, California.<br><br>Respondent. | NO. C_____<br><br>VERIFIED PETITION FOR WRIT OF HABEAS CORPUS (18 U.S.C. § 2254) |

Petitioner, Bobby Antoine McKenzie (hereinafter "petitioner"), files this Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Pursuant to Local Rule 2254-3(d), petitioner is using this form which contains all the information required by the standard form supplied by the clerk of this Court:[1]

**JURISDICTIONAL ALLEGATIONS**

I.  Petitioner is being unlawfully held in custody by the California Department of Corrections at the Kern Valley State Prison at Delano, California, by Lydia C. Hense, Warden of the State Prison. He is prisoner No. F-11447

---

1. Local Rule 2254-3(d) states: "Petitions shall be filed on a form supplied by the Clerk of the Court, and shall be filled in by printing or typewriting. In the alternative, the petition may be in a legible typewritten or written form which contains all of the information required by the court's form."

II.     The name and location of the court which entered the judgment of conviction and sentence under attack herein is the Superior Court of the County of Alameda, Oakland, California. The case number was C144421A.

III.    On March 20, 2003, an information was filed charging petitioner with first degree murder of Abdul Nawabi. Cal. Pen. Code § 187(a).[2] The information also included enhancements for personally using a firearm, personally discharging a firearm, and personally discharging a firearm resulting in great bodily injury and death. § 12022.5(a); § 12022.53(b), (c) & (d). (1 CT 89-90.)

IV.     Petitioner pled not guilty and proceeded to jury trial. On July 20, 2005, the jury found him guilty of first degree murder, and found all enhancements true. (2 CT 420-422.)

V.      The court entered judgment on January 19, 2006, sentencing petitioner to a total prison term of 50 years to life. (2 CT 479; 9 RT 1236.)

VI.     Petitioner timely appealed his conviction. (2 CT 482.) The appeal was heard by the California Court of Appeal for the First Appellate District (Case Number A112837).

VII.    Petitioner raised the following issues on appeal:

A.      The prosecutor violated petitioner's rights under the Sixth Amendment's confrontation clause and the Fourteenth Amendment's due process clause, by: (1) repeatedly introducing, under the guise of questioning witnesses, the inadmissible out-of-court testimonial statements of two key witnesses, Robert Clark and Juanita Davis, who did not testify at trial; (2) intentionally trying to elicit inadmissible statements from witness Bobby McKenzie, Sr. and, when he was unsuccessful, making physical reference to Robert Clark's statement and implying that the statement came from McKenzie, Sr.; (3) asking petitioner questions which implied that he had threatened Juanita Davis and was behind Davis and Clark's failure to testify; and (4) giving a closing argument which repeatedly relied on the insinuations raised by his own improper questions.

---

2.      Unless otherwise stated, all statutory references are to the California Penal Code.

- 2 -

      B.    Defense counsel provided ineffective assistance of counsel, in violation of the Sixth and Fourteenth Amendments, by failing to make contemporaneous objections to various instances of prosecutorial misconduct; and

      C.    The trial court abused its discretion, and violated petitioner's Sixth and Fourteenth Amendment rights to a jury verdict based on the evidence presented at trial, by refusing to grant an evidentiary hearing to determine if the jury engaged in misconduct by relying on facts not in evidence and looking up key words in the dictionary during deliberations.

VIII.  On August 1, 2007, the Court of Appeal affirmed the judgment of conviction, despite agreeing that "the prosecutor engaged in a troubling and extensive pattern of misconduct" which violated petitioner's Sixth Amendment confrontation rights. (Court of Appeal Opinion, pp. 1, 7, 13.)

IX.  Petitioner filed a Petition for Review in the California Supreme Court (Case Number S155998). Petitioner raised the same issues in the petition for review that he had raised at the Court of Appeal. The California Supreme Court denied the Petition for Review without comment on October 31, 2007.

X.  In all post-conviction proceedings, petitioner was represented, under appointment of the Court, by Solomon Wollack, Attorney at Law, P.O. Box 23316, Pleasant Hill, CA 94523.

XI.  Petitioner has no appeal or other proceedings pending in any other court regarding these convictions. He has not previously filed any petition for writ of habeas corpus in federal court.

**CLAIMS FOR RELIEF**

XII.  The grounds upon which petitioner contends he is being held unlawfully in violation of the Constitution and law of the United States are as follows:

\\

\\

\\

**CLAIM NO. 1:** The prosecutor violated petitioner's Sixth Amendment confrontation rights by repeatedly referencing the out-of-court testimonial statements of two key witnesses who were unavailable for trial, and then relying on those statements throughout his closing argument.

Petitioner was denied his Sixth Amendment right to confrontation and his Fourteenth Amendment right to due process, because the prosecutor, under the pretense of questioning witnesses, repeatedly introduced the critical testimonial statements of two witnesses who were not available to testify at trial. The prosecutor then relied on those testimonial statements throughout his closing argument.

The basic facts supporting this claim include, but are not limited to, the following[3]:

A. Petitioner was convicted of the willful, deliberate, and premeditated murder of 62-year old Abdul Nawabi. The killing took place around 1:20 in the morning on September 20, 2002, in the International Boulevard area of Oakland. (2 RT 191-192, 227-233; 6 RT 841-842.) At trial, it was undisputed that petitioner shot Nawabi at close range. However, petitioner testified that he did so in self-defense. Under California law, self-defense is a complete defense to homicide charges when the person who did the killing actually and reasonably believed that it was necessary to prevent imminent death or serious bodily injury. Penal Code, §§ 197, 198; *People v. Williams*, 75 Cal.App.3d 731, 739 (1977). When a person kills out of an actual, but unreasonable, fear of imminent death or serious bodily harm, self-defense vitiates malice and warrants a reduction of murder to voluntary manslaughter. (*People v. Flannel* (1979) 25 Cal.3d 668, 679-680; CALJIC No. 8.40.)

B. Petitioner's girlfriend, Juanita Davis, and his co-worker, Robert Clark, were with petitioner on the morning of the shooting. Also with petitioner were his brother, Dionte, and two girls whom Clark and Dionte had met in Sacramento the previous day. The shooting

---

3. In the interest of economy, this petition sets forth only those facts that are minimally essential to petitioner's legal claims. A more comprehensive Statement of Facts, as well as a more detailed discussion of the facts relevant to the legal issues, are set forth in petitioner's Memorandum of Law, which petitioner hereby incorporates by reference.

- 4 -

1  took place after Clark and the two girls had gotten out of the car, and disappeared for some
2  time.
3      C.    After the shooting, Juanita Davis and Robert Clark both gave statements to the
4  police. (5 RT 659-660; Exhs. 15 & 18.)
5      D.    Davis told the police that the two girls were named Christina and Danielle; that
6  they were both minors; and that they were let out of the car so that they could "turn tricks"
7  for petitioner, Dionte, and Clark. Davis also told the police that, at some point, Christina
8  disappeared. Petitioner believed she had gotten into a Mazda, and directed Davis to follow
9  that Mazda (which, as it turned out, was being driven by Abdul Nawabi). When they caught
10 up to the Mazda, petitioner got out of the car, asking the driver, ""Where (sic) the girl?
11 Where's the girl? Where's the girl?" Nawabi then bent down as if he were reaching for
12 something, at which point petitioner put his hand through the car window and shot him.
13 (Exh. 15, pp. 2-15.)
14     E.    Robert Clark told the police that he, Dionte, and petitioner had gone to the area
15 of 19th and International because they "had some ho's" and were pimping them. When the
16 two girls got out of the car, Clark also got out to watch them. One of the girls got into the
17 car with an older man. The man drove off and, when he returned moments later, the girl was
18 no longer in his car. Petitioner immediately hopped into the Explorer, which drove off in the
19 same direction as the other car. (Exh. 18, pp. 1-18.)
20     F.    The prosecution was unable to serve Robert Clark with a subpoena, and he did
21 not testify at trial. (5 RT 727-732.)
22     G.    The prosecutor had Juanita Davis on his witness list and offered her immunity
23 in exchange for her testimony. Despite the offer, Davis let it be known at the start of trial
24 that she was not going to testify. In light of her decision, the prosecutor conceded, and the
25 court found, that Davis's statement to the police was inadmissible under *Crawford v.*
26 *Washington*, 541 U.S. 36 (2004). (1 RT 72-75, 75-77; 2 RT 128-131.)
27     H.    Because Davis had no Fifth Amendment privilege, the trial court permitted the
28 prosecutor to call her to the stand in the jury's presence. Before he did so, the prosecutor

submitted a list of 13 questions which he proposed to ask Davis. The last 10 questions on the list all concerned the activities which took place in the minutes before the shooting. For example, one question asked whether the "juvenile girls" were "engaging in prostitution." Others asked if one of the girls had gotten into the victim's car, if Davis had followed the car to find out if the girl was inside, and if petitioner had ever asked the victim, "Where's the girl, where's the girl?" (2 RT 122-124; Court's Exh. 3.)

I.  When asked if he had any independent evidence to establish these questions' factual premises, the prosecutor acknowledged that he did not. Emphasizing that it would not permit the prosecutor to present his theory of the case through the questioning of witnesses, the trial court prohibited the prosecutor from asking any of the last 10 questions on his list. (1 RT 142-143.) The court's admonishment was consistent with well-established case law of the United States Supreme Court, which holds that the Sixth Amendment right to confrontation and cross-examination prohibits a prosecutor from using his questioning to bring in inadmissible, extra-judicial testimonial statements from non-testifying witnesses. *Douglas v. Alabama*, 380 U.S. 415, 419 (1965); see also *Hardnett v. Marshall*, 25 F.3d 875 (9th Cir. 1994).

J.  Despite this well-established case law, and despite the court's admonishments, the prosecutor repeatedly asked questions to both petitioner and Dionte, whose sole purpose was to bring before the jury the allegations contained in Juanita Davis and Robert Clark's interviews. For example, during direct examination of Dionte, the following exchange took place:

> Q. Mr. McKenzie, didn't you guys put those two girls on the street at 19th Avenue and International Boulevard to act as prostitutes?
>
> A. No.
>
> Q. Didn't at some point Juanita Davis get out of the car to try to teach them how to turn tricks?
>
> A. No.
>
> Q. There was no agreement with the two girls?

- 6 -

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | When they found a John, they were to merely go around the corner and park and do their trick, and then go back to where you guys were at? |
| 3 | | |
| 4 | A. | No. |
| | Q. | There was no agreement like that? |
| 5 | A. | No. |
| 6 | | |
| 7 | Q. | At some point, one of the girls didn't disappear, and you guys think that she had gotten into the victim's car . . . |
| 8 | Q. | Wasn't there an agreement that when the two girls found a John to do a trick with, they were to park the John's car around the corner and do their trick there? |
| 9 | | |
| 10 | A. | No, no trick, nobody, no. |
| 11 | Q. | At one point – |
| 12 | A. | Nobody's a pimp. Nobody's a trick. Nobody's – like, I don't understand. I don't understand where, like, nobody's – |
| 13 | | |
| 14 | Q. | Let me ask you, have you talked to Juanita Davis about what happened? |
| | A. | No. |
| 15 | Q. | Have you talked to Robert Clark about what happened? |
| 16 | A. | No. Nobody. |
| 17 | | |
| 18 | Q. | One of the girls did not at some point disappear where you guys didn't know where she went? |
| 19 | A. | The girls were with Rob. |
| 20 | Q. | And there was no decision made that you thought that one of the girls had gotten into the victim's car and driven down International Boulevard. That didn't happen, you're saying? |
| 21 | | |
| 22 | (3 RT 475-476.) | |

K. Later, the prosecutor questioned Dionte about whether petitioner had asked the victim, "Where's the girl? Where's the girl?" He also asked Dionte if the two girls were around 15 and 17 and if one of them had complained about needing to be back in school. Dionte denied each question and said the girls told him they were around 19. (3 RT 454-455; 4 RT 509.)

-7-

1      L.     The prosecutor also asked Dionte if he had talked to Clark or Davis about what happened on September 20, 2002; if he knew "their version of events;" if he knew what Clark would have told the police; and if he was afraid that Clark would tell the police "about what you guys were doing with the two girls out on International Boulevard?" (3 RT 478; 4 RT 553.)

     M.     The prosecutor asked these questions in bad faith, in that he knew that Dionte would deny them and knew that he had no way of proving the pimping and prostitution allegations since neither Juanita Davis nor Robert Clark would be available to testify at trial.

     N.     The prosecutor again engaged in this identical tactic when questioning petitioner – repeatedly presenting his questions as long narratives, taken directly from Juanita Davis's post-arrest statement, and proceeded by the phrase "Isn't it true?" For example:

> Q.     Isn't it true that when you guys stopped on International Boulevard near 19th Avenue, your brother Dionte, Juanita Davis, and Robert Clark put the two girls out on the street to be prostitutes?
>
> A.     No.
>
> Q.     Isn't it true that there was an agreement that when the two girls found a John, they were to park, get into the John's car, park around the corner, do their deed, whatever sexual acts there were, and come right back to the corner of 19th and International to work more?
>
> A.     No.
>
> Q.     Isn't it true that at some point, one of the girls, Christina, disappeared?
>
> A.     I don't know. I know once they walked off, I didn't see nobody no more: Her, Robert, or the other girl . . .
>
> Q.     Isn't it true you saw the victim's car pull up next to one of the girls?
>
> A.     No.
>
> Q.     Isn't it true that after one of the girls had disappeared, you made the decision to get into the Explorer and go down International Boulevard, where you had seen the victim drive off to catch up with him to determine whether the girl was in his car?
>
> A.     No.
>
> Q.     Isn't it true that you left Robert Clark there on the corner to remain with the one remaining prostitute?

- 8 -

| | | |
|---|---|---|
|1| A. | No. |
|2| Q. | Isn't it true that when you went down International Boulevard, you pulled up next to the victim's vehicle with you in the fast lane? |
|3| A. | Yeah. We was in the fast lane. |
|4| Q. | And you rolled down your window? |
|5| A. | No. |
|6| Q. | Isn't it true you yelled to the victim, "Where's the girl? Where's the girl?" |
|7| | |
|8| A. | No. For what? No. |

9  (6 RT 861-862.)

10　　O.　The prosecutor returned to these same themes yet again during recross; indeed, he devoted his entire recross to questions about Robert Clark and Juanita Davis's statements, and about what petitioner was "doing on International Boulevard and 19th Avenue if you weren't out there pimping those two girls?" (7 RT 955-956.)

14　　P.　The prosecutor compounded the confrontation violation by engaging in additional improper questioning during cross-examination of defense witness, Bobby McKenzie, Sr. – petitioner's father.

17　　Q.　On cross, the prosecutor established that Robert Clark walked to Bobby, Sr.'s house shortly after the shooting had occurred. Later, the prosecutor asked Bobby, Sr. whether Clark had told him what they "were doing with two girls" on International Boulevard. When Bobby, Sr. replied that Clark had not told him, the prosecutor asked, "Did you say to Robert Clark, quote, 'I told you you shouldn't be doing that, especially out here?'" Bobby, Sr. again denied the question. The prosecutor then held papers in his hand and asked, "Would you like to see a transcript?" Defense counsel immediately objected and asked for a bench conference, stating, "It's not this Witness's transcript, and you know it." (6 RT 790, 794-795.)

26　　R.　The prosecutor's questioning of Bobby, Sr. constituted further misconduct, in that he intentionally tried to elicit inadmissible hearsay from the witness and, when he was unsuccessful, again resorted to the tactic of using his questioning to bring before the jury the

- 9 -

inadmissible testimonial statements of a critical, but unavailable, witness. In this case, the prosecutor's misconduct was made all the more egregious by the fact that he literally announced that he had a transcript of Bobby Sr.'s prior statements – an announcement which would have been improper even if it were true. In fact, it was false – as the transcript did not reflect the prior statements of Bobby, Sr.; it reflected the prior testimonial statements of Robert Clark, which the prosecutor knew full well were inadmissible.

S. The prosecutor also exacerbated his misconduct, and committed additional misconduct, by asking petitioner if he had "threatened Ms. Davis not to testify in this case?" When petitioner responded that he had not, the prosecutor followed up by asking if he had "direct[ed] any of your friends to threaten Ms. Davis not to testify in this case." As the prosecutor knew full well, there was not a shred of evidence that petitioner had ever threatened Davis, either directly or through a confederate.

T. The prosecutor also asked petitioner a series of questions which implied that petitioner was behind both Davis's decision not to testify and Clark's decision to avoid process – though there was no evidence of either point. For instance, he asked if petitioner knew about Davis and Clark's taped statements to defense counsel; if he drove Davis or Clark to defense counsel's office; if he had anything to do with either's decision not to testify; and if Davis had sat with his family during a previous court appearance. When petitioner denied that Juanita Davis had sat with his family during previous court appearances, the prosecutor decided to take matters into his own hands and testify himself, stating, "Mr. McKenzie, I was in the courtroom." (6 RT 867-869.)

U. Likewise, while questioning Dionte McKenzie, the prosecutor implied that Dionte tried "to prevent the police from knowing about Robert Clark" out of fear that Clark "would tell the police about what you guys were doing with the two girls out on International Boulevard." There was no evidence that either petitioner or Dionte tried to prevent Robert Clark from talking to the police or had anything to do with his failure to be served with a subpoena. (4 RT 553.)

V.   By advancing inferences that were unsupported by the evidence, and which he knew to be false, or had "very strong reason to doubt," the prosecutor committed misconduct, which both exacerbated his other misconduct and which, in and of itself, infected the trial with unfairness and violated petitioner's Fourteenth Amendment due process rights. *United States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002); *Dudley v. Duckworth*, 854 F.2d 967 (7th Cir. 1988).

W.   Finally, the prosecutor repeatedly relied on his own improper questioning throughout his closing arguments. At least six times during closing argument, the prosecutor reminded the jurors that Juanita Davis and Robert Clark didn't testify at trial. (7 RT 1085, 1092-1093; 8 RT 1195-1197.) He also reminded the jurors that, even though they hadn't heard from Clark or Davis, they had "heard my questions of the defendant" and "obviously [knew] my theory of the case." (7 RT 1085.) In fact, just to make sure that the jurors really had heard his questions, the prosecutor then took pains to lay out each of the questions he had asked petitioner about prostitution – each time reminding the jury that petitioner had denied the question. (7 RT 1092-1093.) The unmistakable purpose of the prosecutor's arguments was to convey the message: (1) that the allegations contained in his questions were true; (2) that the allegations were based on Clark and Davis's out-of-court statements; and (3) that petitioner was lying when he denied the questions posed to him.

X.   The prosecutor's repeated misconduct had a "substantial and injurious effect" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Without the improper insinuations contained in the prosecutor's questions and argument, there was literally no explanation – other than the one provided by the defense – as to why petitioner would shoot a 62-year old man whom he had never met before. The evidence at trial showed an almost random shooting that made no sense, except as an act committed in self-defense (reasonable or otherwise) or, at worst, a sudden act committed with neither the pre-existing reflection nor the "careful thought and weighing of considerations" required to commit willful, deliberate, and premeditated murder under California law. *People v. Anderson*, 70 Cal.2d 15, 26 (1968). The pimping insinuations created a motive and a context for

explaining this killing. Absent the prosecutor's repeated misconduct, the jury could easily have harbored a reasonable doubt as to whether petitioner acted with premeditation or malice in shooting Abdul Nawabi and, thus, whether he should be convicted of first degree murder or some lesser crime.

**CLAIM NO. 2: Defense counsel provided ineffective assistance of counsel, in violation of the Sixth and Fourteenth Amendments, by failing to make contemporaneous objections to various instances of prosecutorial misconduct.**

To the extent, if any, that this Court finds any aspect of the prosecutorial misconduct claims waived and/or procedurally defaulted due to a state court finding of waiver, then defense counsel's failure to object to certain incidents of prosecutorial misconduct deprived petitioner of his Sixth Amendment right to the effective assistance of counsel.

The basic facts supporting this claim include, but are not limited to, the following:

A. Although defense counsel did not object to every instance of prosecutorial misconduct that is the subject of this petition, he did object to many. (See Court's Exh. 4, p. 3; 3 RT 476; 6 RT 794-795, 867-870.) He also filed a motion for new trial, based on the prosecutor's repeated improper questions to witnesses. The California Court of Appeal addressed the Sixth Amendment confrontation and Fourteenth Amendment due process arguments on their merits, finding that petitioner "preserved these issues through multiple objections and was not required to object to each and every related question." (Opinion, pp. 14-15, fn. 5.)

B. The one aspect of petitioner's prosecutorial misconduct argument which the Court of Appeal found waived, due to lack of an objection, was petitioner's sub-argument that the prosecutor committed misconduct by asking questions which implied that petitioner was responsible for Juanita Davis's refusal to testify and for Robert Clark's avoidance of process. (Opinion, pp. 14-15, fn. 5.) To the extent that this Court finds this, or any other, aspect of petitioner's prosecutorial misconduct/confrontation argument to be waived and/or procedurally defaulted, then defense counsel's failure to object was unreasonable "under

1  prevailing professional norms," and deprived petitioner of the effective assistance of counsel which the Sixth Amendment guarantees him. *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

C. Defense counsel's actions belie any possible tactical reason for his failure to object. During closing argument, counsel repeatedly objected when the prosecutor suggested that the defense should logically have called Clark and Davis and that petitioner was somehow at fault for their failure to testify. (8 RT 1195-1198.) Such actions show that counsel was concerned about the inference that petitioner was responsible for the witness's unavailability at trial. Given these concerns, counsel would not have intentionally allowed the prosecutor to ask questions which advanced this identical inference.

D. "The potential of unfair prejudice from the introduction of threats is 'severe.'" *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996), quoting *United States v. Check*, 582 F.2d 668, 685-686 (2nd Cir. 1978). Furthermore, by introducing the inference that petitioner had threatened witnesses or procured their absence, the prosecutor exacerbated the prejudice arising from his repeated confrontation violations. Petitioner, after all, would have no reason to procure Clark and Davis's unavailability unless the witnesses had damaging information to provide at trial. Thus, by advancing the inference that petitioner had threatened these witnesses or was behind their unavailability, the prosecutor further fed into the idea that Clark and Davis would implicate petitioner in pimping and prostitution activities if they were available to testify at trial. Without the pimping and prostitution allegations, there was neither a motive nor context, to explain why petitioner would have killed Abdul Nawabi at all – let alone do so, willfully, deliberately, and with premeditation.

E. Accordingly, but for defense counsel's failure to object to the prosecutor's improper questions, it is reasonably probable that the jury would have either accepted petitioner's claim of self-defense or, at the least, convicted him of a lesser degree of homicide.

\\

\\

**CLAIM NO. 3:** **The trial court abused its discretion, and violated petitioner's Sixth and Fourteenth Amendment rights to a jury verdict based on the evidence presented at trial, by refusing to grant an evidentiary hearing to determine if the jury engaged in misconduct by relying on facts not in evidence and looking up key words in the dictionary during deliberations.**

Petitioner was denied his Sixth and Fourteenth Amendment rights to a jury verdict, because the trial court refused to grant a post-trial evidentiary hearing after petitioner presented an investigator's declaration which showed that four jurors admitted to relying on facts not in evidence, and three jurors acknowledged that the jury looked up words in the dictionary during deliberations.

The basic facts supporting this claim include, but are not limited to, the following:

A. After the verdict, petitioner filed a motion for access to juror identifying information. (2 CT 442-449.) The trial court gave each of the 12 jurors written notice of the hearing date on petitioner's motion. Ten jurors responded that they did not want their identifying information released. The court permitted defense counsel to make contact only with the remaining two. (2 CT 462; RT [Oct. 20, 2005]: 1214.) Later, on December 7, 2005, the court clarified that defense counsel could still make contact with all 12 jurors, provided he could obtain their contact information from legal, public sources. (9 RT 1216-1217.)

B. On January 13, 2006, petitioner filed a request for an evidentiary hearing on the grounds of juror misconduct. (Defense Mot. for New Trial, p. 1.) In support of that motion, petitioner included a sworn declaration from investigator Patricia de Larios Peyton. Peyton detailed her post-verdict interviews with three jurors – Jurors 6, 7, and 8 – as well as her unsuccessful efforts to contact four other jurors – Jurors 3, 5, 10, and 11. On January 19, Peyton filed a supplemental declaration, in which she added further detail about her interviews, while also making brief mention of a fourth interview – with Juror 1 – conducted by her associate. (Peyton Supp. Decl.)

  C. According to the declarations, Jurors 6, 7, and 8 each told Peyton that there was a consensus among the 12 jurors that petitioner was in the area of 19th and International because he was engaging in pimping activities. (Peyton Supp. Decl., ¶¶ 7(b), 8(d) & 9(c)-(e).) All three jurors also agreed that the prosecutor knew of substantial additional evidence which was never presented at trial, including evidence of petitioner's pimping activities. ((*Id.* ¶¶ 7(b)-(g), 8(d) & 9(c)-(e).) In particular, the jurors believed that Juanita Davis and Robert Clark's statements to the police contained evidence which implicated petitioner in pimping activities. (*Id.* ¶¶ 7(c)-(e), 8(d) & 9(c)-(d).  A fourth juror, Juror 1, was less specific, but stated that she was "very aware of the questions by the DA which implied that there was pimping and prostitution." (*Id.* ¶ 10.)

  D. In addition, Jurors 6, 7, and 8 all stated that, while deliberating, the jury consulted a dictionary for the definition of certain words. Juror 6 said that, while she did not recall with certainty, she believed the words that they looked up had to do with premeditation and intent. (Peyton Supp. Decl., ¶¶ 7(a), 8(b), & 9(a)-(b).)

  E. Peyton was unable to follow up with, or obtain declarations from, any of the aforementioned jurors. Juror 8 moved out of the Bay Area after trial and would not provide Peyton with his new home address. (Peyton Decl., ¶ 4; Peyton Supp. Decl., ¶ 8(h).) Peyton could not get in touch with Juror 6 after the initial interview. (Peyton Supp. Decl., ¶ 9(h).) Juror 7 was "friendly and forthcoming" during her original interview with Peyton, but when Peyton attempted a follow-up interview on December 28, 2005, the juror declined to be interviewed or give a declaration, stating, "I spoke with [the prosecutor], and I am not going to sign anything." (*Id.*, ¶ 6.)

  F. At the January 19, 2006 hearing, the court found that, even if the jury improperly speculated into petitioner's pimping activities, that speculation could not have affected its determination regarding the degree of homicide. The court therefore denied petitioner's request for an evidentiary hearing. (9 RT 1233-1235.)

  G. Where the jury considers facts not in evidence, it violates the accused's Sixth Amendment rights to confrontation and to a jury verdict based on the evidence presented at

trial. *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000); *Jeffries v. Wood*, 114 F.3d 1484, 1490-1492 (9th Cir. 1997). Similarly, where the jury consults a dictionary, it constitutes juror misconduct which deprives the defendant of his Sixth Amendment rights to confrontation, cross-examination, and the effective assistance of counsel. *United States v. Kupau*, 781 F.2d 740, 744 (9th Cir.), *cert. denied*, 479 U.S. 823 (1986); *Gibson v. Clanon*, 633 F.2d 851, 854-855 (9th Cir. 1980), *cert. denied*, 450 U.S. 1035 (1981). By denying petitioner an evidentiary hearing into his claims of juror misconduct, the trial court deprived him of the opportunity to develop an adequate factual record for evaluation of the apparent violation of his recognized constitutional rights.

## CAUSE EXCUSES ANY PROCEDURAL DEFAULT

Petitioner asserts that no procedural default has occurred as to any claim set forth herein that would preclude federal review. However, if any has, there exists cause and prejudice sufficient to excuse any such default.

## PRAYER FOR RELIEF

WHEREFORE, petitioner prays that this Court:

1. Issue a writ of habeas corpus to have him brought before this Court, so that he might be discharged from his unconstitutional confinement and restraint;

2. Order respondent to answer this petition by specifically admitting or denying each allegation and claim made herein;

3. Require respondent to bring forth the entire state court record so that this Court can review those parts of the record that are relevant to the issues raised in this proceeding; and

4. Grant such other relief as may be appropriate and necessary to dispose of the matter as justice may require.

DATED: July 18, 2008

SOLOMON WOLLACK
Specially Appearing for Petitioner
Bobby Antoine McKenzie

# VERIFICATION

I, Solomon Wollack, state as follows:

That I represented petitioner in his appeal to the California Court of Appeal for the First Appellate District, and also wrote his petition for review to the California Supreme Court. As a result, I am in the best position to verity the information contained in this petition. My address is:

Solomon Wollack
Attorney at Law
P.O. Box 23316
Pleasant Hill, CA 94523

I verify under penalty of perjury that all information contained in this petition is true and correct.

Executed this 18th day of July at Pleasant Hill, California.

*[signature]*
Solomon Wollack
Specially Appearing for Petitioner
Bobby Antoine McKenzie

- 17 -

# PROOF OF SERVICE

I, Solomon Wollack, am employed in the City of Pleasant Hill, County of Contra Costa, State of California. I am over the age of 18 and not a party to the within action; my business address is P.O. Box 23316, Pleasant Hill, CA 94523.

On July 18, 2008, I served the following:

**VERIFIED PETITION FOR WRIT OF HABEAS CORPUS (18 U.S.C. § 2254); and**

**MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS (18 U.S.C. § 2254)**

Service was made to the following persons by placing a true copy thereof, enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail at Pleasant Hill, California, addressed to the following persons:

| | |
|---|---|
| Mr. Christopher J. Wei<br>Deputy Attorney General<br>California Attorney General's Office<br>455 Golden Gate Avenue,<br>Suite 11,000<br>San Francisco, CA 94102 | **By United States mail** |
| Mr. Bobby Antoine McKenzie<br>F11447   D-7-221L<br>Kern Valley State Prison<br>P.O. Box 5104<br>Delano, CA 93216 | **By United States Mail** |

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in Pleasant Hill, California, on July 18, 2008.

_____
Solomon Wollack