1  SOLOMON WOLLACK (Cal. Bar No. 170003)
   Attorney at Law
2  P.O. Box 23316
   Pleasant Hill, CA 94523
3  (925) 671-2501

4  Specially Appearing for Petitioner
   Bobby Antoine McKenzie
5

FILED

JUL 22 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

6
7              UNITED STATES DISTRICT COURT

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10                                    CV  08      3512

11  BOBBY ANTOINE MCKENZIE,          )  NO. C_____
                                     )
12          Petitioner,              )
                                     )
13      vs.                          )
                                     )
14  LYDIA C. HENSE, Warden           )
    of Kern Valley State Prison, Solano, at )
15  Delano, California.              )
                                     )
16          Respondent.              )
                                     )
17  _____)

18

19

20        MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR

21                WRIT OF HABEAS CORPUS

22                  (18 U.S.C. § 2254)

23

24

25

26                                    ORIGINAL

27

28

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.    The September 20, 2002 Shooting . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    Dorialynn Butcher . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    III.    The Police Arrive at the Shooting Scene . . . . . . . . . . . . . . . . . . . . . 4

    IV.    The Events Leading up to the Shooting . . . . . . . . . . . . . . . . . . . . . . . 4

        A.    Petitioner's father gives him a gun . . . . . . . . . . . . . . . . . . . . . 4

        B.    The trips to Sacramento and San Francisco . . . . . . . . . . . . . . . 5

        C.    The events in Oakland . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        D.    The shooting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        E.    The minutes following the shooting . . . . . . . . . . . . . . . . . . . . 8

    V.    The Police Interviews . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    I.    The Prosecutor Violated Petitioner's Sixth and Fourteenth Amendment Rights to Confrontation and Due Process by Repeatedly Introducing, under the Guise of Questioning Witnesses, the Inadmissible Out-of-court Testimonial Statements of Two Key Witnesses Who Were Unavailable for Trial, and Then Relying on Those Out-of-court Statements During Closing Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            1.    Juanita Davis and Robert Clark's statements to the police . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            2.    Juanita Davis at trial . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            3.    Robert Clark at trial . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            4.    The prosecutor's opening statement . . . . . . . . . . . . . . . . 14

            5.    Dionte McKenzie's trial testimony . . . . . . . . . . . . . . . . . 15

            6.    Bobby McKenzie, Sr.'s testimony . . . . . . . . . . . . . . . . . 17

            7.    Petitioner's testimony . . . . . . . . . . . . . . . . . . . . . . . . . . 18

8. The prosecutor's closing argument . . . . . . . . . . . . . . . . . . . . 21

9. Petitioner's motion for new trial . . . . . . . . . . . . . . . . . . . . . 25

B. The prosecutor violated petitioner's Sixth Amendment confrontation rights by repeatedly referencing the out-of-court testimonial statements of Juanita Davis and Robert Clark, throughout the questioning of witnesses . . . . . . . . . . . . . . 26

C. The prosecutor engaged in misconduct by intentionally trying to elicit inadmissible statements from Bobby McKenzie, Sr. and, when he was unsuccessful, by making physical reference to a transcript of Robert Clark's statement and implying that the statement came from McKenzie, Sr. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

D. The prosecutor engaged in misconduct, and exacerbated his other misconduct, by asking petitioner questions which implied that he had threatened Juanita Davis and was behind Davis and Clark's failure to testify . . . . . . . . . . . . . . 32

1. The procedural default rule does not prevent this Court from addressing whether the prosecutor committed misconduct by implying that petitioner had threatened witnesses or was behind their unavailability for trial . . . . . . . . . . . . . . . . . . . . . . . . . . 33

E. The prosecutor engaged in misconduct, and exacerbated his earlier misconduct, by citing his own improper insinuations during closing argument . . . . . . . . . . . . . . . . . . . . . . . 35

F. Because the prosecutor's misconduct infected the trial with unfairness, and had a substantial and injurious effect on the jury's verdict, petitioner's conviction and punishment must be set aside . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

G. The Court of Appeal erred by finding the misconduct to be harmless beyond a reasonable doubt . . . . . . . . . . . . . . . . . . . 40

1. The properly admitted evidence did not remotely support an inference that petitioner was engaged in pimping and prostitution – let alone that such pimping activities were what gave rise to the shooting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

2. The evidence of willful, deliberate, and premeditated murder was far short of overwhelming . . . . . . . . . . . . . . . . . 42

3. The trial court's instructions did not cure the prosecutorial misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . 45

II.    Defense Counsel Provided Ineffective Assistance, in Violation of the Sixth Amendment, by Failing to Adequately Object When the Prosecutor Implied That Petitioner Had Threatened Juanita Davis and Was Behind Davis and Robert Clark's Unavailability for Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

III.    The Trial Court Violated Petitioner's Sixth and Fourteenth Amendment Rights to a Jury Verdict Based on the Evidence Presented at Trial by Refusing to Grant an Evidentiary Hearing to Determine If the Jury Engaged in Prejudicial Misconduct During Deliberations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    A.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    B.    The trial court abused its discretion, and violated petitioner's Sixth and Fourteenth Amendment rights, by failing to grant petitioner's request for an evidentiary hearing to determine if the jury improperly relied on facts not in evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

    C.    The trial court abused its discretion by refusing to grant an evidentiary hearing to determine if the jury looked up key words in the dictionary during deliberations . . . . . . . . . . . . . 50

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

1

# TABLE OF AUTHORITIES

2
*Brecht v. Abrahamson*, 507 U.S. 619
3
    (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Collier v. Bayer*, 408 F.3d 1279
4
    (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

5
*Conaway v. Polk*, 453 F.3d 567
6
    (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Crawford v. Washington*, 541 U.S. 36
7
    (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

8
*Donnelly v. DeChristoforo*, 416 U.S. 637
9
    (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Douglas v. Alabama*, 380 U.S. 415
10
    (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-28

11
*Dudley v. Duckworth*, 854 F.2d 967
12
    (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Estate of Packer*, 164 Cal. 525
13
    (1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

14
*Ford v. Georgia*, 498 U.S. 411
15
    (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-34

*Gibson v. Clanon*, 633 F.2d 851
16
    (9th Cir. 1980), *cert. denied*, 450 U.S. 1035 (1981) . . . . . . . . . . . . . . . . . . . . . . . 50

17
*Hardnett v. Marshall*, 25 F.3d 875
18
    (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-28, 39

*Jeffries v. Wood*, 114 F.3d 1484
19
    (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

20
*Marino v. Vasquez*, 812 F.2d 499
21
    (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 51

*Melendez v. Warden*, 288 F.3d 1120
22
    (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

23
*Michigan v. Long*, 463 U.S. 1032
24
    (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

25
*People v. Anderson*, 70 Cal.2d 15
    (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

26
*People v. Blackington*, 167 Cal.App.3d 1216
27
    (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*People v. Flannel*, 25 Cal.3d 668
28
    (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

1   *People v. Hill*, 17 Cal.4th 800
2       (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 45

   *People v. Jones*, 53 Cal.3d 1115
3       (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

4   *People v. Lee*, 219 Cal.App.3d 829
5       (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

   *People v. Lopez*, 71 Cal.App.4th 1550
6       (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

7   *People v. Rios*, 163 Cal.App.3d 852
8       (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

   *People v. Williams*, 17 Cal.4th 148
9       (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

10  *Sassounian v. Roe*, 230 F.3d 1097
11      (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

   *Strickland v. Washington*, 466 U.S. 668
12      (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

13  *Sullivan v. Louisiana*, 508 U.S. 275
14      (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 45

15  *United States v. Beeks*, 224 F.3d 741
        (8th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 40

16  *United States v. Blueford*, 312 F.3d 962
17      (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

18  *United States v. Cudlitz*, 72 F.3d 992
        (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 45

19  *United States v. Davenport*, 753 F.2d1460
20      (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 30, 40, 45

21  *United States v. Hall*, 989 F.2d 711
        (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 31, 39-40 45

22  *United States v. Johnson*, 127 F.3d 380
23      (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

24  *United States v. Kupau*, 781 F.2d 740
        (9th Cir.), *cert. denied*, 479 U.S. 823 (1986) . . . . . . . . . . . . . . . . . . . . 50

25  *United States v. McPhee*,731 F.2d 1150
26      (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

27  *United States v. Polizzi*, 801 F.2d 1543
        (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

28

*United States v. Sanchez*, 176 F.3d 1214
        (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Silverstein*, 737 F.2d 864
        (10th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Simtob*, 901 F.2d 799
        (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Sine*, 493 F.3d 1021
        (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Steele*, 91 F.3d 1046
        (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 39

*Yates v. Evatt*, 500 U.S. 391
        (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Ylst v. Nunnemaker*, 501 U.S. 797
        (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**STATUTES**

Evidence Code

        Section 353 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        Section 771 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        Section 1200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Penal Code

        Section 189 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**UNITED STATES CONSTITUTION**

Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 27

Sixth Amendment  . . . . . . . . . . . . . . . . . . . . . . . . 11, 26-27, 30, 38, 40, 45-48, 50

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . 11, 32, 38, 47-48

**OTHER AUTHORITIES**

Dictionaries

        American Heritage Dictionary (2d college ed. 1985) . . . . . . . . . . . . . . . . . . . 51

        Merriam-Webster Online Dictionary . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

CALJIC Jury Instructions

CALJIC No. 8.20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 51-52

CALJIC No. 8.40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Model Criminal Jury Instructions (9th Cir. 2003 ed.)

No. 1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

1  SOLOMON WOLLACK (Cal. Bar No. 170003)
   Attorney at Law
2  P.O. Box 23316
   Pleasant Hill, CA 94523
3  (925) 671-2501

4  Specially Appearing for Petitioner
   Bobby Antoine McKenzie

5

6

7               UNITED STATES DISTRICT COURT

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10

11  BOBBY ANTOINE MCKENZIE,              )    NO. C_____
                                         )
12          Petitioner,                  )    MEMORANDUM OF LAW
                                         )    IN SUPPORT OF PETITION FOR
13      vs.                              )    WRIT OF HABEAS CORPUS
                                         )    (18 U.S.C. § 2254)
14  LYDIA C. HENSE, Warden               )
    of Kern Valley State Prison, Solano, at )
15  Delano, California.                  )
                                         )
16          Respondent.                  )
                                         )
17  _____)

18                    **INTRODUCTION**

19      Petitioner was convicted of willful, deliberate, and premeditated murder. At trial, the

20  prosecutor's entire theory of the case was based on the out-of-court testimonial statements

21  of Robert Clark and Juanita Davis – two participants who were unavailable at trial. Though

22  the statements were kept out of evidence by the trial court, the prosecutor repeatedly used his

23  cross-examination of witnesses to make the jury aware of not only the existence of Clark and

24  Davis's out-of-court statements, but also their content. The prosecutor didn't use this tactic

25  just once or twice. He used it dozens, if not hundreds, of times. And he did it despite

26  knowing that the witnesses would deny the insinuations suggested by his questions and that

27  he had no way to "prove up" those insinuations. Later, he repeatedly brought up his own

28  questions during closing argument – each time reminding the jury that Clark and Davis had

                              - 1 -

1  given statements to the police, but weren't available for trial. By the end of trial, the jury was

2  as familiar with the contents of Clark and Davis's out-of-court statements as if the statements

3  had been formally introduced and played at trial. Indeed, the jurors even acknowledged as

4  much. Though there was no evidence that petitioner was engaged in any pimping or

5  prostitution activities, four jurors told a defense investigator that the jury believed the

6  shooting was prostitution related, and it believed that Robert Clark and Juanita Davis would

7  have said so, if they had been called to testify. Despite the jurors' statements, the trial court

8  declined to order a new trial or to order an evidentiary hearing into petitioner's claims of

9  juror misconduct.

10      Petitioner now seeks relief from his incarceration on the grounds that: (1) pervasive

11  prosecutorial misconduct infected his trial with unfairness and enabled the prosecutor to

12  obtain a first degree murder conviction that he could not have otherwise obtained; and (2)

13  the trial court erred by failing to order an evidentiary hearing into petitioner's showing that

14  the jury relied on facts not in evidence and engaged in additional misconduct during

15  deliberations.

16                        **STATEMENT OF FACTS**[1/]

17  **I.    The September 20, 2002 Shooting**

18      Around 1:20 a.m. on September 20, 2002, petitioner shot and killed Abdul Nawabi

19  while Nawabi was inside his car near the corner of 49th and East 12th Avenues in Oakland.

20  An autopsy showed that Nawabi was killed by a single bullet wound to the left side of his

21  face, in front of his left ear. (2 RT 191-192, 227-233; 6 RT 841-842.) The bullet passed

22  through Nawabi's brain, fracturing his skull and both cheekbones. (2 RT 195-198.)

23      The area surrounding the bullet wound revealed gunshot stippling, consisting of small

24  red dots where the gunpowder embedded itself in Nawabi's skin. (2 RT 192.) The presence

25

26  _____

27      1. With but minor changes, the Statement of Facts, as well as the Background section
   of Argument No. I, are taken from petitioner's opening brief at the California Court of
28  Appeal. Petitioner has left all record citations in place, so that this Court can easily access
   the cited facts once the appellate record is eventually filed with this Court.

1  of stippling indicates that the person was shot at close range, with the gun's barrel perhaps

2  as close as four to six inches away from Nawabi's head. (2 RT 215-216; 6 RT 760.)

3      The autopsy revealed therapeutic levels of Flurazepam in Nawabi's system. (2 RT

4  198-199.) Flurazepam is an anti-anxiety drug. (2 RT 198, 206.)

5      Nawabi was 62 years old at the time of his death. (5 RT 649.)

6  **II.   Dorialynn Butcher**

7      Shortly before the shooting, Dorialynn Butcher was prostituting on the corner of

8  International Boulevard (also known as East 14th Avenue) and 49th Avenue. (2 RT 222,

9  299.) Butcher was on probation and had been ordered to stay out of this area of International,

10  which was a high prostitution area. (2 RT 224; 3 RT 378; 5 RT 678.) Noticing a police

11  officer across the street, she decided to walk down 49th, in the direction of 12th, so that the

12  officer wouldn't see her. As Butcher walked, she spoke to a friend on her cell phone. (2 RT

13  224-226.)

14      Butcher saw a car make a left-hand turn from East 12th onto 49th, where it parked and

15  turned off its lights. In the area where the car was parked, a street light was out, making it

16  very dark. Butcher thought the car contained a prostitute and her "John." (2 RT 227-228.)

17      Moments later, a Ford Explorer came quickly around the corner, from the same area

18  where the first car had come. The Explorer stopped suddenly, facing diagonally toward the

19  first car so that the Explorer's right front fender was close to the other car's left front fender.

20  (2 RT 229-230.) A male passenger got out of the front passenger seat, stepped toward the

21  other car, and fired a single gunshot. (2 RT 233-235.) Afterwards, the passenger

22  immediately got back in the Explorer, which sped off down 49th, then made a right onto

23  International. (2 RT 235-238.)

24      After the shooting, Butcher ran back to Officer Victor Arvizu, the police officer she

25  had seen earlier. Butcher told the officer that she saw someone get shot. Butcher described

26  the car involved as a white Ford Explorer and she gave a description of where it had headed.

27  Arvizu aired this information over the radio system. (2 RT 238-239; 3 RT 341-343, 346-

28  348.)

1    Two days after the shooting, Butcher was arrested for prostitution and, four days after

2  that, she was arrested for felony sale of narcotics. She eventually pled guilty to the charges

3  and received a probationary disposition. As part of her plea agreement, the prosecutor agreed

4  to drop her prior conviction for narcotics sales. (2 RT 273-274.)

5    Butcher acknowledged that she had smoked crack about six hours before the incidents

6  she described in her testimony; however, she claimed that she no longer felt its effects. (2

7  RT 243-244.)

8  **III.    The Police Arrive at the Shooting Scene**

9    At the shooting scene, Officer Arvizu found Nawabi seated upright with his head

10  tilted toward the right passenger's side of the car. Nawabi was still alive, but was bleeding

11  from his head and mouth and had a visible powder burn on his cheek. When Arvizu went

12  to check his pulse, Nawabi turned toward him, then opened the car door and got out. Nawabi

13  was stumbling around, appearing disoriented, so Arvizu tried to hold him upright. (3 RT

14  351, 353-355.) The paramedics arrived within minutes and took Nawabi to the hospital. (3

15  RT 356, 374.) Arvizu later learned that Nawabi died at the hospital. (3 RT 372-373.)

16    Inside Nawabi's car, on the front passenger's floorboard, police found a spent bullet

17  casing from a .25 caliber gun. (3 RT 362, 390, 392, 439.) Outside the car, near the driver's

18  side rear door, they found a .25 caliber live round – that is, a bullet still inside its casing,

19  which had not been shot from the gun. (3 RT 365, 390-391.) Lansing Lee, a criminalist with

20  the Oakland Police Department's crime laboratory, testified that a live bullet could wind up

21  on the ground either because someone dropped it or because it was ejected when someone

22  pulled back the gun's slide while a bullet was loaded in the chamber. (3 RT 425-426.) No

23  weapon was found inside Nawabi's car. (5 RT 615-616.)

24  **IV.    The Events Leading up to the Shooting**

25    A.    *Petitioner's father gives him a gun*

26    Two to three months before the shooting, petitioner's father, Bobby, Sr., gave him a

27  gun. Petitioner wanted the gun because he often went fishing in the woods and had once

28  been confronted by a wild elk. (6 RT 784, 787, 815.) Along with the gun, Bobby, Sr. also

gave petitioner some bullets. Bobby, Sr. did not show petitioner how the gun worked. (6 RT 788.)

As it turned out, this particular model of gun had a defect which could cause it to accidentally fire if dropped while a round is in the chamber. As a result of this defect, the manufacturer sent out a recall notice for the gun. (6 RT 762.) John Jacobson, a senior forensic scientist at Forensic Analytical, ran two tests in which he tried to get petitioner's gun to accidentally discharge. (6 RT 755, 773.) On the first test, he hit the back of the gun with a hammer. The test caused the cartridge in the chamber to discharge. On the second test, he put a loaded cartridge into the chamber, then pulled the hammer back to the first notch. This second test did not cause the cartridge to discharge from the gun. (6 RT 773-744, 779.)

Besides taking the gun when he went fishing, petitioner also took it with him to work. (6 RT 817, 852-853.) At the time, petitioner was working as a longshoremen at the Port of Oakland. (6 RT 789, 801, 817.) The Port of Oakland is in a dangerous area, and petitioner often got off work late at night. (6 RT 817, 852-853.)

During the week before the shooting, petitioner had gone fishing in Suisun. Before the trip, petitioner loaded the gun by attaching the magazine, with the bullets already in it, and by moving the slide so that a bullet fell into the chamber. (6 RT 818-819, 852.) When the fishing trip ended, petitioner had the gun in the pocket of his peacoat. Afterward, he put the whole peacoat in his closet, with the gun still inside. Petitioner put the coat back in the car later that week because he thought his turn in the longshoreman rotation might be coming up. (6 RT 821-823.)

Until the night of the shooting, petitioner had never fired this, or any other, gun. (6 RT 840; 7 RT 954.)

B.    *The trips to Sacramento and San Francisco*

In September, 2002, petitioner lived in Martinez with his younger brother Dionte. (3 RT 445-446.) Petitioner was 25; Dionte was 19. (6 RT 796, 802.) Although no one else lived with the two brothers, petitioner's co-worker Robert Clark often spent the night. (2 RT 446-447; 6 RT 801-802, 807-808.) Clark was close in age to Dionte and the two became

- 5 -

1  good friends.  Clark, Dionte and a person named Jamal formed a rap band called Hardnox.

2  Petitioner was their manager.  (3 RT 450-451; 6 RT 802-804.)

3      On Wednesday, September 18, petitioner, Dionte, and Clark took Clark's Ford

4  Explorer to Sacramento, where they hoped to sell CDs in front of Arden Mall.  While there,

5  Clark and Dionte met two girls, whom they took back to Martinez.  In Martinez, both

6  petitioner and Dionte slept in their own rooms; the girls and Clark slept in the living room.

7  (3 RT 453-454, 461-462; 6 RT 804-807.)

8      The next morning, the five of them drove the Explorer to Vallejo, where petitioner's

9  mother lived.  Next, they went to Oakland to pick up petitioner's girlfriend, Juanita Davis,

10  from the beauty shop.  Davis joined the other five in the Explorer.  (3 RT 463-466; 6 RT 802,

11  809-810.)

12      Around 4:00 or 5:00 in the afternoon, the six arrived in San Francisco, where they sold

13  CDs on Market Street, in front of Virgin Records.  (3 RT 467-468; 6 RT 812.)  Afterwards,

14  they ate at McDonalds, then headed back to the East Bay around 10:00 or 11:00.  (3 RT 468-

15  469; 6 RT 813.)  Juanita Davis drove.  (3 RT 473.)

16      C.    *The events in Oakland*

17      On the way back to Martinez, Clark wanted to stop in Oakland because he had a

18  cousin who lived in the area of 19th and International.  (3 RT 470; 6 RT 860; 7 RT 949.)

19  Davis parked near a store so that Clark could buy some Black and Mild cigars.  Clark then

20  got out of the Explorer, along with the two girls.  (3 RT 473-474; 6 RT 813-814.)

21      Shortly after Clark and the two girls left, petitioner also got out of the car to smoke

22  a Black and Mild.  It was cold outside, so he put on his jacket.  (6 RT 823-824.)  A car

23  pulled up on the opposite side of the street and the driver began speaking and gesturing at

24  petitioner as if "something was wrong with him."  Petitioner was unable to understand what

25  the man was saying.  After about ten seconds, the man pulled away.  Petitioner would later

26  find out that the man was Nawabi.  (3 RT 477; 6 RT 827-830.)

27

28

1    A few minutes later, Nawabi drove by again. (3 RT 479; 6 RT 829.)  By this time,
2  petitioner had gotten back in the Explorer.[2]  Again Nawabi appeared as if he was trying to
3  tell petitioner something and, again, petitioner was unable to understand him. (6 RT 830-
4  831.)

5    After Nawabi drove off, petitioner, Dionte, and Davis decided to leave. (6 RT 831.)
6  Clark and the two girls had been gone for awhile, so petitioner figured Clark had gone to his
7  cousin's house. (7 RT 948-949.)

8    Davis wanted to get some clothes from her house because she was spending the night
9  in Martinez. (3 RT 505; 6 RT 831.)  Davis was still driving, with petitioner in the front
10  passenger seat and Dionte in the back. (3 RT 504-505.)  On the way to Davis's house, they
11  ran into Nawabi again.  Nawabi was in the right-hand lane, while Davis was in the fast lane.
12  As they pulled up to the traffic light at International and High Street, the two cars were side
13  by side.  Again, Nawabi gestured and said something, which petitioner was unable to hear.
14  When Nawabi spoke, his face "frowned up" and he looked as if he might be confused or hurt.
15  (3 RT 508-509; 6 RT 831-833.)  Petitioner asked him what was wrong. (3 RT 585-586.)

16    Nawabi motioned as if he wanted the Explorer to follow him. (3 RT 510; 6 RT 833.)
17  Petitioner made the decision to follow Nawabi because he was concerned there might be
18  something medically or physically wrong with him. (3 RT 521-522; 6 RT 834, 836.)  Davis
19  cut behind Nawabi and followed him as he made a right-hand turn off International, then a
20  left onto East 12th and another left onto East 49th. (3 RT 515-516, 518-520; 6 RT 834-835.)
21  Both petitioner and Dionte testified that neither Nawabi nor Davis was speeding or driving
22  particularly fast. (3 RT 520; 6 RT 835.)  Petitioner denied that they were "chasing" Nawabi.
23  (6 RT 834-835.)

24  \ \

25

26    2.    Dionte testified that petitioner was in the Explorer the first time
27         Nawabi drove by, and that he was outside smoking during
         Nawabi's second drive-by. (3 RT 479.)  Petitioner recalled that
28         it was the other way around. (6 RT 828-830.)

D.    *The shooting*

After turning onto East 49th, Nawabi pulled over and stopped. Davis pulled in close to him, perhaps three feet away from Nawabi's car. (6 RT 835.) Petitioner got out of the Explorer, walked up to Nawabi's window, and asked if something was wrong. (3 RT 522, 525; 6 RT 836-837.) Nawabi immediately became "hysterical" and began screaming at petitioner. Nawabi's eyes became bloodshot and red and he looked like he had "turned into the devil or something." Feeling scared, petitioner backed away from Nawabi's window. As he was doing so, Nawabi reached toward the passenger's side of the car, stating, "I'm going to kill you." Petitioner thought Nawabi was reaching for a gun and that he was about to get shot. (3 RT 837-840.)

Petitioner turned around to run, but found himself hemmed in by the Explorer. He could have run in a different direction but he was afraid that, if he did, Nawabi might shoot him in the back. (6 RT 839-840; 7 RT 952.)

Petitioner reached into his coat pocket and grabbed his gun, but it slipped out of his hand and fell to the ground. Petitioner bent down to pick it up and, as he did, the gun fired. At trial, petitioner was unable to say whether he had fired the gun intentionally. (6 RT 840-842; 7 RT 951.) Petitioner testified that everything happened very quickly, that he was not aiming the gun at Nawabi, and that he had no memory of actually shooting the gun. When he heard the shot, he was unsure if it was he or Nawabi who had fired it and he was unaware Nawabi had been hit. (6 RT 842-843, 882.)

E.    *The minutes following the shooting*

Upon hearing the shot, petitioner jumped back inside the Explorer. (4 RT 497; 6 RT 843, 883.) Dionte was crying and asked petitioner what had happened. (4 RT 498, 527.) Petitioner told Dionte he was sorry and stated, "I was scared. He was going to kill me." (6 RT 886; see also 3 RT 497.)

Davis drove down 49th and made a right-hand turn onto International. (4 RT 537.) Petitioner put the gun on the floor and kicked it underneath the front seat, fearing that the

- 8 -

1   police might shoot him if they saw it. The gun ended up by Dionte's feet. (4 RT 540; 6 RT

2   844, 887-888.)

3       Around 1:21 a.m., Officers Mayer and Thurston stopped the Explorer while it was on

4   High Street, heading in the direction of the 880 freeway on-ramp. (2 RT 302, 304-306.)

5   After making the stop, Thurston noticed that the rear passenger seemed to be bending down

6   as if he were trying to hide something. (2 RT 308.)

7       With guns drawn, the officers ordered the Explorer's occupants out of the car. (2 RT

8   309-315.) During an ensuing search, the officers found the gun on the right rear floorboard,

9   wrapped inside a jersey. (3 RT 323.) They also found some bullets in the car's cup-holder,

10  underneath a blue cup. (5 RT 608-609.)

11      At trial, Dionte admitted that he had wrapped the gun in a jersey and placed it under

12  the front passenger seat because he didn't want the police to see it when they opened the

13  door. (4 RT 540-541.) However, petitioner testified that he didn't want to involve anyone

14  else, so he told the police that he was the one to wrap the gun in the jersey. (6 RT 871, 892;

15  7 RT 959.) Petitioner acknowledged that he put some bullets in the center console but did

16  not recall placing a plastic cup over them. (6 RT 887.)

17  **V.     The Police Interviews**

18      September 20, 2002 was Officer Mark Dunakin's first day as a homicide investigator

19  for the Oakland Police Department. (5 RT 645.) After the shooting, he and a more senior

20  detective, Sergeant Derwin Longmire, interviewed the Explorer's three occupants. (5 RT

21  650.)

22      The officers conducted a 46-minute interview with Juanita Davis. (5 RT 659-660.)

23  After the interview ended, they interviewed Dionte for nearly an hour and a half. Dionte told

24  the officers that he fell asleep after leaving McDonald's and was still asleep when the

25  shooting occurred. (5 RT 662-663.) At trial, Dionte admitted that this was false, but stated

26  that he was trying to protect his brother. (3 RT 481-482; 4 RT 574.)

27      The officers next interviewed petitioner, obtaining a taped statement from him. (6 RT

28  658, 663.) Petitioner told the officers that he thought there was something wrong with

- 9 -

1  Nawabi after he flagged them down and told them to follow him. He also told the officers

2  that he had shot Nawabi because Nawabi said "I'm gonna kill you," while reaching for his

3  glove compartment. (Exh. 17, p. 2.) Petitioner did not mention that he had gotten the gun

4  from his father, but said that he had bought it from someone for $50. (Exh. 17, p. 9.) At

5  trial, petitioner admitted that this was untrue, but testified that he had not wanted to involve

6  his father in the incident. (6 RT 850; 7 RT 953.)

7       Petitioner told the officers he could think of no reason that Nawabi had come up and

8  started yelling at him. He denied being involved in pimping, denied that Robert Clark or the

9  two girls had anything to do with the shooting, and denied that the shooting was about

10  prostitution. (Exh. 17, pp. 12, 15.) However, he did tell the police that a video camera found

11  inside the Explorer contained footage of "pimps on there and stuff, and prostitution earlier

12  today." (Exh. 17, p. 17; 6 RT 871.) Petitioner testified that the camera actually belonged to

13  Robert Clark, but that he didn't tell the police this because he wanted to "take blame for

14  everybody." He also testified that the only reason he knew what was on the camera was

15  because he had been standing next to a female police officer while she was playing the

16  footage from the camera. (6 RT 845, 871-872.) Neither of the two girls from Sacramento

17  was depicted on the video footage. (7 RT 945.)

18       After interviewing petitioner, the two officers took him to the room where Dionte was

19  being held. (5 RT 665.) Petitioner told Dionte that he had admitted being the shooter. (4

20  RT 554.) Dionte then agreed to give a taped statement to the police. (5 RT 666.)

21       Dionte told the police that Nawabi had pulled up across the street, begun "talking

22  shit," then driven off. When he returned, petitioner and Nawabi "exchanged words." Juanita

23  Davis followed Nawabi. At some point, both cars stopped. Petitioner got out of the car and

24  a "tussle" ensued. Nawabi then mentioned something about his glove compartment and

25  petitioner shot him. (Exh. 16, pp. 3-8.)

26       At trial, Dionte explained that, when he referred to a "tussle," he was referring to a

27  quick movement by Nawabi. (4 RT 536, 591.) Also at trial, Dionte denied that petitioner

28  and Nawabi had exchanged words and denied that petitioner asked Nawabi why he was

1  "talking shit." (4 RT 530.) He testified that Sergeant Longmire was verbally abusive,

2  repeatedly telling Dionte that he was going to jail and that he would never see his brother

3  again. (4 RT 548, 569-570, 576, 578.) Longmire, who is African American, kept referring

4  to himself as the "NIC," which Dionte took to mean "Nigga in Charge." (4 RT 595, 597.)

5  He also made repeated references to the power which he held over Dionte. (4 RT 570, 578.)

6  Dionte was scared and decided to tell the police whatever they wanted to hear so that they

7  would let him go. (4 RT 531.)

8       Both Longmire and Officer Dunakin denied that Longmire ever referred to himself

9  as the NIC, yelled at or threatened Dionte, or made mention of his power. (5 RT 670-671,

10 718.)

## ARGUMENT

### I.

**The Prosecutor Violated Petitioner's Sixth and Fourteenth Amendment Rights to Confrontation and Due Process by Repeatedly Introducing, under the Guise of Questioning Witnesses, the Inadmissible Out-of-court Testimonial Statements of Two Key Witnesses Who Were Unavailable for Trial, and Then Relying on Those Out-of-court Statements During Closing Argument.**

17      Petitioner was convicted of the willful, deliberate, and premeditated murder of 62-year

18 old Abdul Nawabi, a man he had never met before. Petitioner admitted shooting Nawabi,

19 but testified that he did so because Nawabi threatened to kill him and appeared to be reaching

20 for something. The prosecutor presented no evidence to show any other motive behind the

21 shooting.

22      Robert Clark and Juanita Davis were with petitioner in the hours before the shooting.

23 Both gave statements to the police. According to their statements, the shooting arose out of

24 a prostitution-related dispute, after an underage prostitute in petitioner's employ got into

25 Nawabi's car and disappeared.

26      Neither Clark nor Davis was available to testify at trial. Despite this fact, and despite

27 being specifically warned against presenting his case theory through the questioning of

28 witnesses, the prosecutor repeatedly used this very tactic to make the jury aware of not only

1   the existence of Clark and Davis's statements, but also their contents – including the

2   allegation that the shooting arose over a pimping and prostitution related dispute. Worse

3   still, during closing argument, the prosecutor continually cited his own improper questions

4   as "evidence" in support of his theory of willful, deliberate, and premeditated murder.

5          The California Court of Appeal found that the prosecutor engaged in "serious and

6   protracted misconduct." (Opinion, p. 7.) However, it found the error harmless beyond a

7   reasonable doubt, in light of the court's instructions to the jury and what it characterized as

8   the "overwhelming" evidence of petitioner's guilt. (Opinion, p. 14.) In fact, without Davis

9   and Clark's extra-judicial statements, the evidence of premeditation was not only far from

10  overwhelming; it was thoroughly scant. Thus, petitioner's conviction and sentence should

11  be set aside.

12  **A.    Background**

13         1.    *Juanita Davis and Robert Clark's statements to the police*

14         After the shooting, Juanita Davis and Robert Clark both gave statements to the police.

15  (5 RT 659-660; Exhs. 15 & 18.)

16         Davis told the police that the two girls from Sacramento were named Christina and

17  Danielle and that they were 15 and 17 years old. Davis added that, at one point, Christina

18  mentioned that she was supposed to be in school that day. (Exh. 15, pp. 2, 11.)

19         Davis also told the police that Christina and Danielle were let out of the Explorer so

20  that they could "turn tricks" for petitioner, Dionte, and Clark. (Exh. 15, p. 11.) Neither had

21  ever prostituted before and both were scared about doing so. Davis got out of the car with

22  them in order make them feel more comfortable. (Exh. 15, pp. 3-4.)

23         At some point, Christina disappeared. Petitioner, Dionte, and Davis decided to go

24  look for her. Clark and Danielle remained outside the car. (Exh. 15, pp. 4-5.)

25         Petitioner directed Davis to follow a Mazda, which they thought Christina had gotten

26  into. When they caught up to the Mazda, petitioner asked its driver where the girl was. The

27  man in the Mazda drove away and Davis followed, eventually stopping the car next to the

28  Mazda. Petitioner got out of the car, shouting, "Where (sic) the girl?  Where's the girl?

- 12 -

1   Where's the girl?"  The man then bent down as if he were reaching for something, at which

2   point petitioner put his hand through the car window and shot him.  (Exh. 15, pp. 5-9.)

3        Davis told the police that one of the cameras inside the Explorer belonged to

4   petitioner; the other belonged to Clark.  Petitioner had reportedly wanted to record the girls

5   "walkin' up and down the street" but the battery in his camera was dead.  Davis was not

6   present when anything on either video camera was filmed.  (Exh. 15, p. 15.)

7        Robert Clark gave a statement five days after the shooting.  (Exh. 18, p. 1.)  Clark told

8   the police that he, petitioner, and Dionte had gone to the area of 19th and International

9   because they "had some ho's" and were pimping them.  He stated that they had met these two

10  girls at the mall in Sacramento.  Both girls told them they were over 18 and Clark believed

11  both to be between 18 and 20.  (Exh. 18, pp. 4-7, 15.)

12       When the two girls got out of the car, Clark also got out to watch them.  One of the

13  girls got into the car with an older man.  The man drove off and, when he returned moments

14  later, the girl was no longer in his car.  Petitioner immediately hopped into the Explorer,

15  which drove off in the same direction as the other car.  (Exh. 18, pp. 10-14.)

16       Around 4:30 a.m., Clark walked to the house of Bobby McKenzie, Sr. – petitioner's

17  father.  Clark told Bobby, Sr. what they had been doing on International Boulevard.  Bobby,

18  Sr. responded, "I told you, you shouldn't be doing that.  Especially out here."  (Exh. 18, p.

19  18.)

20       2.    *Juanita Davis at trial*

21       The prosecutor put Davis on his witness list and offered her immunity.  (1 RT 74-75.)

22  Despite the grant of immunity, and despite a court order, Davis let it be known at the start

23  of trial that she was not going to testify.  (1 RT 72-73, 75-77; 2 RT 128-131.)  In light of her

24  decision, the prosecutor conceded, and the court found, that Davis's statement to the police

25  was inadmissible under *Crawford v. Washington*, 541 U.S. 36 (2004).  (1 RT 81; 2 RT 141-

26  142.)

27

28

- 13 -

1    Because Davis had no Fifth Amendment privilege, the trial court permitted the

2   prosecutor to call her to the stand in the jury's presence[3]. (2 RT 122-124.) The prosecutor

3   submitted a list of 16 questions which he proposed to ask Davis. (Court's Exh. 3.) The last

4   11 questions all concerned the activities which took place in the minutes before the shooting.

5   For example, one question asked whether the "juvenile girls" were "engaging in

6   prostitution." Others asked if one of the girls had gotten into the victim's car, if Davis had

7   followed the car to find out if the girl was inside, and if petitioner had ever asked the victim,

8   "Where's the girl, where's the girl?" (Court's Exh. 3.)

9    The trial court prohibited the last ten questions after the prosecutor acknowledged that

10   he did not have independent evidence to establish any of the questions' factual premises. In

11   this regard, the court repeatedly emphasized that it would not permit the prosecutor to present

12   his theory of the case through the questioning of witnesses, since "no matter how much I

13   notify the jury that a question is not evidence, that does not unring a bell." (2 RT 142-143.)

14    Later, the court also added that it did "not want there to be any implication that Mr.

15   McKenzie has threatened or intimidated the Witness." (2 RT 142.)

16    3.    *Robert Clark at trial*

17    Robert Clark did not testify at trial. The prosecution did, however, call Christopher

18   Lux, an inspector with the District Attorney's Office, to testify about his efforts to locate

19   Clark at various Bay Area addresses and telephone numbers. The efforts were unsuccessful

20   and Lux was unable to serve the subpoena on Clark. (5 RT 727-732.)

21    While the prosecutor was not permitted to introduce Clark's taped statement to the

22   police, the jury was aware, through Officer Dunakin's testimony, that Clark had made the

23   statement. (5 RT 675-676.)

24    4.    *The prosecutor's opening statement*

25    During his opening statement, the prosecutor repeatedly said that Juanita Davis had

26   given a taped statement to the police, but had recently stopped cooperating with law

27

28    3.    See *People v. Lopez*, 71 Cal.App.4th 1550 (1999).

- 14 -

enforcement and would not be testifying at trial. The prosecutor also told the jury that he would be asking Dionte "if the two juvenile girls were being put out on the street by them as prostitutes," but that Dionte would "probably deny it." The prosecutor then reminded the jurors, yet again, that they would not be hearing Juanita Davis's statement to the police. (2 RT 168-171.)

     5.   *Dionte McKenzie's trial testimony*

The prosecutor called Dionte and obtained court permission to treat him as a hostile witness. (3 RT 444-445; 4 RT 494.)

During direct examination of Dionte, the following exchange took place:

Q.    Mr. McKenzie, didn't you guys put those two girls on the street at 19th Avenue and International Boulevard to act as prostitutes?

A.    No.

Q.    Didn't at some point Juanita Davis get out of the car to try to teach them how to turn tricks?

A.    No.

Q.    There was no agreement with the two girls?

A.    No.

Q.    When they found a John, they were to merely go around the corner and park and do their trick, and then go back to where you guys were at?

A.    No.

Q.    There was no agreement like that?

A.    No.

Q.    At some point, one of the girls didn't disappear, and you guys think that she had gotten into the victim's car? (3 RT 475-476.)

Defense counsel objected on the grounds that there was "Nothing to base this on." (3 RT 476.) The court overruled the objection and the prosecutor continued:

Q.    Wasn't there an agreement that when the two girls found a John to do a trick with, they were to park the John's car around the corner and do their trick there?

A.    No, no trick, nobody, no.

Q.    At one point –

- 15 -

A.    Nobody's a pimp.  Nobody's a trick.  Nobody's – like, I don't understand.  I don't understand where, like, nobody's –

Q.    Let me ask you, have you talked to Juanita Davis about what happened?

A.    No.

Q.    Have you talked to Robert Clark about what happened?

A.    No.  Nobody.

Q.    One of the girls did not at some point disappear where you guys didn't know where she went?

A.    The girls were with Rob.

Q.    And there was no decision made that you thought that one of the girls had gotten into the victim's car and driven down International Boulevard.  That didn't happen, you're saying?  (3 RT 476.)

Later, the prosecutor questioned Dionte about whether petitioner had asked the victim, "Where's the girl?  Where's the girl?"  (4 RT 509.)  He also asked Dionte if the two girls were around 15 and 17 and if one of them had complained about needing to be back in school.  Dionte denied each question and said the girls told him they were around 19.  (3 RT 454-455.)

The prosecutor also asked Dionte if he had talked to Clark or Davis about what happened on September 20, 2002.  When Dionte said he had not, the prosecutor asked, "So you don't know their version of events?"  Dionte said he did not and the prosecutor followed up by stating, "You're sure about that?"  (3 RT 478.)

The prosecutor returned to this same theme later on in his direct examination, asking Dionte:

Q.    Is it fair to say you didn't want the police to talk to Robert Clark, right?

A.    I wouldn't say that.  I just – I don't know.

Q.    If the police went to Robert Clark and took a taped statement from him, you knew what Robert Clark would say, right?

A.    Can --

Q.    Were you afraid if the police found out about Robert Clark, that he would tell the police about what you guys were doing with the two girls out on International Boulevard?

- 16 -

A.    No. I know.

Q.    That's not the reason why you chose to tell the police initially that Robert Clark wasn't with you?

A.    No, sir.

Q.    You didn't – let me say words more clear. You weren't trying to prevent the police from knowing about Robert Clark with you earlier that night, were you? (4 RT 553.)

6.    *Bobby McKenzie, Sr.'s testimony*

Petitioner's father, Bobby McKenzie, Sr., testified as a defense witness. On cross, the prosecutor established that Robert Clark walked to Bobby, Sr.'s house shortly after the shooting had occurred. (6 RT 790.) Later in the cross-examination, the prosecutor asked Bobby, Sr. whether Clark had told him what he, Dionte, and petitioner "were doing with two girls." Bobby, Sr. replied that Clark had not. (6 RT 794.) The prosecutor then followed up:

Q.    Did you say to Robert Clark, quote, "I told you you shouldn't be doing that, especially out here?"

A.    I don't know anything about Robert Clark. I just met him. He worked with my son. I don't know anything about that guy.

Q.    Would you like to see a transcript?

Mr. Hanlon:    Your Honor, I object. Wait. It's not this Witness's transcript, and you know it.

Mr. Owens:    I'm asking –

Mr. Hanlon:    This is improper, Judge. We should approach. (6 RT 794-795.)

A bench conference ensued, followed by an unreported conference in chambers. Afterwards, the prosecutor resumed his cross-examination by asking Bobby, Sr. if he had had a conversation with Dionte about "what had happened earlier in the night?" Bobby, Sr. denied that such a conversation ever took place. The prosecutor then started to ask, "Didn't Dionte tell you what –"; defense counsel interrupted the question with an objection and, after a bench conference, the prosecutor stated that he had no further questions of Bobby, Sr. (6 RT 795.)

\ \

\ \

- 17 -

1          7.      *Petitioner's testimony*

2                  During cross-examination, the prosecutor repeatedly questioned petitioner about why

3      he was in the area of International and 19th.  Many of the prosecutor's questions consisted

4      of long narratives, prefaced with the words "Isn't it true."  For example:

5          Q.      Isn't it true that when you guys stopped on International Boulevard near 19th
                   Avenue, your brother Dionte, Juanita Davis, and Robert Clark put the two girls
6                  out on the street to be prostitutes?

7          A.      No.

8          Q.      Isn't it true that there was an agreement that when the two girls found a John,
                   they were to park, get into the John's car, park around the corner, do their
9                  deed, whatever sexual acts there were, and come right back to the corner of
                   19th and International to work more?
10
           A.      No.
11
           Q.      Isn't it true that at some point, one of the girls, Christina, disappeared?
12
           A.      I don't know.  I know once they walked off, I didn't see nobody no more: Her,
13                 Robert, or the other girl . . .

14         Q.      Isn't it true you saw the victim's car pull up next to one of the girls?

15         A.      No.

16         Q.      Isn't it true that after one of the girls had disappeared, you made the decision
                   to get into the Explorer and to down International Boulevard, where you had
17                 seen the victim drive off to catch up with him to determine whether the girl
                   was in his car?
18
           A.      No.
19
           Q.      Isn't it true that you left Robert Clark there on the corner to remain with the
20                 one remaining prostitute?

21         A.      No.

22         Q.      Isn't it true that when you went down International Boulevard, you pulled up
                   next to the victim's vehicle with you in the fast lane?
23
           A.      Yeah.  We was in the fast lane.
24
           Q.      And you rolled down your window?
25
           A.      No.
26
           Q.      Isn't it true you yelled to the victim, "Where's the girl?  Where's the girl?"
27
           A.      No.  For what?  No.  (6 RT 861-862.)
28

- 18 -

1    Later, the prosecutor asked a series of questions about statements given at defense

2   counsel's office by Robert Clark and Juanita Davis.[4]  For instance, he asked whether

3   petitioner drove Clark and Davis to counsel's office and he repeatedly asked whether

4   petitioner knew about the statements which Clark and Davis had given.[5]  When the court

5   sustained defense objections, on the ground that the questions assumed facts not in evidence,

6   the prosecutor simply disregarded the court's ruling and continued questioning petitioner

7   about the statement Clark had given to defense counsel.  Defense counsel again objected and

8   the court again sustained the objection.  Yet, the prosecutor immediately followed up by

9   asking the same question with regard to Juanita Davis's statement.  After the court sustained

10  a third defense objection, it admonished the prosecutor to only ask "questions which relate

11  facts that are in evidence."  Despite the admonition, the prosecutor's next two questions were

12  whether petitioner had "threaten[ed] Ms. Davis not to testify in this case," or whether he had

13  directed anyone else to do so.  Petitioner said that he had not.  (6 RT 867-869.)  The

14  prosecutor then asked:

15      Q.    Now, Ms. Davis was going to be a witness against you in this case, correct?

16      A.    No.

17      Q.    Well, before this trial started, she sat with you and your family in court, right?

18      A.    No . . .

19      Q.    On June 6th, when this case first appeared in Department 11 on our seventh
20            floor to be sent here for trial, Ms. Davis was sitting over here with you, your
              brother, and your mom, correct?

21      A.    No.

22      Q.    Mr. McKenzie, I was in the courtroom.  (6 RT 869.)

23  Defense counsel objected to the prosecutor's comment and the court admonished him not to

24  "testify or personalize your questions."  (6 RT 870.)

25  _____

26  4.    Neither statement was ever offered into evidence.

27  5.    The prosecutor presented no evidence to show that petitioner
28        drove either Clark or Davis to counsel's office or knew about
          the statements they had given.

- 19 -

1      The prosecutor returned to these same themes yet again during recross; indeed, he

2   devoted his entire recross to questions about Robert Clark and Juanita Davis's statements,

3   and about what petitioner was doing on International Boulevard:

Q.      Why would you be afraid to tell the police about what you guys were doing on International Boulevard and 19th Avenue if you weren't out there pimping those two girls?

A.      I wasn't afraid. I just didn't want anybody else involved.

Q.      You knew they had already talked to Juanita, so they already knew about Robert, right?

A.      I didn't know who they had already talked to. I was in a room by myself.

Q.      They had said at the beginning of your tape (sic) interview they had asked you you were with Robert Clark, right?

A.      Yes.

Q.      And two girls. They were the ones were with Robert Clark and the two girls, right?

A.      Yes.

Q.      Have you spoken to Robert Clark about his version of events on 19th Avenue and International.

A.      No, I haven't.

Q.      You say you haven't spoken even to Juanita Davis about her version of the events?

A.      No, I haven't. Ever since this happened it's bothering me every day. I didn't want to talk about it. My family don't talk about it.

Q.      You didn't want to listen to Robert Clark's statement to police?

A.      No, I didn't.

Q.      You didn't want to listen to Juanita Davis's statement to the police?

A.      No, I didn't.

Q.      You say you have nothing to do with Juanita Davis, your girlfriend, going to jail instead of testifying against you in this case.

A.      No, I didn't.

Mr. Hanlon:      Instead of testifying what?

The Court:       Against you in this case.

- 20 -

Mr. Hanlon:    I object. I'd ask that be stricken.

The Court:    I will strike that question and answer.

Mr. Owens:    You have nothing go do with Robert Clark not testifying in this case?

A.    No, I don't.

Mr. Owens:    I have nothing further.

(7 RT 955-956.)

    8.    *The prosecutor's closing argument*

During his closing and rebuttal arguments, the prosecutor repeatedly emphasized petitioner and Dionte's denial of pimping activities, while suggesting that, had Juanita Davis and Robert Clark testified, their testimony would have rebutted petitioner's denials. For example:

> I could understand if you had a situation – and obviously you know my theory of the case, you didn't hear from Robert Clark, you didn't hear from Juanita Davis, you heard my questions of the defendant. Why they left Robert Clark stranded even though they took his Explorer, why Robert Clark had to go to the defendant's dad's house, tell him what happened.

> But even if you don't believe he came after this victim, if he thought the victim had a prostitute, or that he came after him because his brother says because the victim was talking shit. Even if you don't believe that, what the defendant sees when he gets there is no weapon, no gun. (7 RT 1085.)

Similarly, when discussing petitioner's testimony, the prosecutor stated:

> He denies at that time two girls were put out on the street on International Boulevard near 19th Avenue to prostitute. He denies that. He (sic) didn't hear from Juanita Davis, you didn't hear from Robert Clark.

> He denies that the two girls had been told when you find a John you drive around the corner to the John's car, you park. When you're done you come back to the corner where you were standing.

> He denies that at some point one of the girls had disappeared. They didn't know where she went. Juanita and the defendant and Robert Clark and Dionte are kind of freaking out. He denies that. Trying to figure out where did she go. Wracking their brains.

- 21 -

He denies when they got together where did she go. They remember a small car coming around and they remember her talking to a guy in a small car. He denies that.

He denies that they thought that small car went down International Boulevard and he denies that there was an agreement, a quick agreement, that basically defendant, his brother Dionte McKenzie and Juanita Davis were going to get in the Explorer, go down International and see if they can catch up with the victim. Robert Clark was going to be left with the one remaining prostitute because she is still working . . .

He denies that that's why they went down International Boulevard. He denies it when they pulled up to the victim's car, he denies saying "Where is the girl?" He denies at that point the victim rolled down his window to figure out what they were saying, and when he realized he continued on and went down the side street. The defendant denies all this.

And Juanita Davis refused to testify. Robert Clark's family wouldn't tell us where he is. But you did get to hear one thing: You got to hear that Robert Clark went to the defendant's father's house after this happened. (7 RT 1092-1094.)

At this point, the court interrupted the prosecutor's argument to give the jury a ten-minute recess. (7 RT 1094.) After the recess ended, the prosecutor immediately resumed his earlier argument:

This is where I left off. Remember the defendant when he gives this statement to police doesn't want to say anything about International Boulevard and 19th Avenue.

The defendant testified that he came into Oakland with the two girls, Robert Clark, Dionte McKenzie and Juanita Davis between 10:00 and 11:00, roughly. But they can't account for what they did before the shooting at 1:20. They come into Oakland, they go to International near 19th. Robert Clark just gets out to go into the store to get a cigarette. What are they doing for two to three hours? He can't account for that. (7 RT 1094-1095.)

After a brief pause to talk about the shooting itself, the prosecutor returned to the prostitution argument a short time later:

Dionte is honest about the Explorer stopping on International Boulevard near 19th Avenue. He just won't say anything about prostitution. Here's what he gives to his answer to this question. "What were the girls doing?" His answer, "Standing there." On International Boulevard near 19th. Again, he denies they were prostituting but he says they were standing there . . .

- 22 -

They took off from International Boulevard near 19th Avenue because it was some dude talking shit to his brother. He basically admits that his brother went after the victim except he denies it's over prostitution. He's saying it's because the victim is talking shit to his brother. But he admits that the reason they left International Boulevard and 19th Avenue and left Robert and the two girls stranded there – that's assuming that both girls were still there – was because they were going after the victim. Dionte admits to that.

Both of them – remember again, Robert ended up at defendant's father's house later. He walked all that way. Both of them left Robert Clark and the two girls stranded. They didn't tell them where they were going? Doesn't make sense, does it? It's Robert's Explorer. They take off in his car and leave him; whether it's still one girl or two girls, just leave him there, don't say anything? They just take off? Doesn't make sense. (7 RT 1099-1100.)

During his rebuttal argument, the prosecutor yet again brought up the prostitution issue, this time in discussing Dionte's credibility:

Mr. Hanlon tried to get Sergeant Longmire to give an opinion that Dionte McKenzie was not a criminal based on the fact that Dionte McKenzie did not have a county rap sheet. And Sergeant Longmire wouldn't give that opinion because Sergeant Longmire heard from all the witnesses in the case. He didn't just hear from Bobby McKenzie and his brother Dionte McKenzie, he took a statement from Robert Clark, he took a statement from Juanita Davis, he saw the evidence, and his opinion that Dionte McKenzie was a criminal that night was based on everything he knew, not just printing up a rap sheet, county rap sheet that didn't have any entries, and so he based his decision on whether Dionte, in his mind, was a criminal on all the evidence that he had access to.

And let me talk about Robert Clark and Juanita Davis because Mr. Hanlon talks about me asking you to speculate, and there are a couple things you can do. Number 1, you can make reasonable inferences based on the evidence or the failure to provide evidence. And the second thing is you can consider either side's failure to call logical witnesses.

What about Robert Clark? What do you know about Robert Clark? You know that Robert Clark is a close friend of the defendant – (8 RT 1194-1195.)

Defense counsel objected on the ground that neither side has an obligation to call witnesses. The court sustained the objection, to which the prosecutor protested that "A side's failure to call a logical witness may be commented upon." The court reiterated that it was

- 23 -

1   sustaining the objection. (8 RT 1195.) The prosecutor then continued with the same

2   argument:

> 3    What do we know about Robert Clark? Robert Clark is the
> defendant's friend, he was his co-worker, he lived together part-
> 4    time with him. We know that. The defendant says, "I haven't
> talked to him in two years," but you know that they had his
> 5    number, defense admitted to you that they had his phone
> number. I asked Bobby McKenzie, "Did you know that Robert
> 6    Clark had been at your attorney's office in San Francisco on
> May 31st, 2005?" What do you know? My inspector took the
> 7    stand and was able to testify that we knew [Robert Clark] was
> in San Francisco on May 31st, 2005. Why wouldn't they
> 8    subpoena him? . . .
>
> 9    He would be a critical witness because he would say, "Yeah,
> this video of pimps and prostitutes is my video. We weren't
> 10    doing anything illegal on 19th and International." Why
> wouldn't they call him?
> 11
> What you know is Robert Clark was stranded. They took off in
> 12    Robert Clark's Explorer and didn't even tell them they were
> leaving. He ended up having to go to the defendant's father's
> 13    house. When I asked the defendant's father about the
> conversation he had had with Robert Clark he completely
> 14    clammed up and wouldn't say anything.
>
> 15    So why if they have access to Robert Clark, why wouldn't they
> subpoena him? (8 RT 1195-1196.)

16

17    Defense counsel made yet another objection. The court sustained it and asked the

18    prosecutor to move to another argument. Despite the admonition, the prosecutor's very next

19    statement was to remind the jury that he had tried to get in touch with Clark but was unable

20    to do so; that Clark had given a taped statement to the police; and that, "without him as a

21    witness you don't get to hear that." Defense counsel objected that the prosecutor was asking

22    the jury to speculate. The court agreed, admonishing the prosecutor that "we cannot admit

23    hearsay statements unless we have the witness on the stand. Please do not ask the jury to

24    speculate as to the contents of these statements which, as you're aware, are inadmissible."

25    Yet, the very next subject the prosecutor brought up was the fact that Juanita Davis too had

26    given a taped statement and that "She would have known everything that happened. From

27    what was going on on 19th and International to the shooting to after, she knows everything

28    because she was there the entire time." The prosecutor then reminded the jury that Davis had

- 24 -

1  been offered immunity for her testimony, which meant – in the prosecutor's words – "She

2  could have gotten on the stand and said 'I shot him' and I couldn't have prosecuted her, and

3  that was fine. I agreed to that." The court struck the prosecutor's argument insofar as he

4  stated his "concurrence" with the law. However, it overruled defense counsel's objection

5  that the prosecutor had misstated the law. (8 RT 1196-1198.)

6      The prosecutor then continued, arguing that if Juanita Davis couldn't be prosecuted

7  for her testimony, "then why is she going to jail rather than testifying?" The court

8  immediately admonished the prosecutor not to ask the jury "to speculate as to the motivation

9  of the people who were not present in court." (8 RT 1198.)

10      9.    *Petitioner's motion for new trial*

11      After the jury returned its guilty verdict, petitioner filed a motion for new trial based

12  on the prosecutor's prejudicial misconduct. (Defense Mot. for New Trial, pp. 1, 5-12.) As

13  the motion described, the prosecutor used both his questioning of other witnesses, and his

14  own courtroom displays, to reinforce the message that his assertions were based on Davis and

15  Clark's statements:

16          [T]he prosecutor used tactics that implied he possessed evidence
          unknown to the jury, but known to him. The prosecutor, as he
17          questioned witnesses, would hold papers in his hand as if he had
          a transcript or statement from that witness and/or another
18          witness. He would then tailor his questions as if he had
          "evidence" or "statements" that were contained in these papers.
19          The prosecutor would use this tactic when referring to Juanita
          Davis and Robert Clark, the two unavailable witnesses, and
20          when he questioned witnesses about the defendant's
          involvement in pimping and prostitution. (Defense Mot. for
21          New Trial, p. 7.)

22      Defense counsel followed up on these same points at the hearing on the motion,

23  stating that the prosecutor actually "held transcripts of tapes in his hand" while asking

24  petitioner questions like, "Isn't it true that these girls were prostitutes, isn't it true that you

25  were pimping, isn't it true that Mr. Clark didn't want to be here because his testimony would

26  contradict you, isn't it true you stopped Juanita Davis from testifying because she would

27  contradict you." (9 RT 1224.) The prosecutor responded that the questions he asked of

28  petitioner and Dionte were proper and that there was only one occasion – during the

1   questioning of Bobby, Sr. – that he held a transcript in his hand while questioning a witness.

2   (9 RT 1230.)

3         The trial court agreed with defense counsel that the prosecutor had improperly

4   "attempted to bring suppositions of prostitution and statements before the jury." However,

5   the court maintained that the misconduct did not affect the jury's determination as to either

6   guilt or the degree of homicide.  It therefore denied the motion for new trial. (9 RT 1233-

7   1234.)

8   **B.**    **The prosecutor violated petitioner's Sixth Amendment confrontation rights by**
    **repeatedly referencing the out-of-court testimonial statements of Juanita Davis**
9   **and Robert Clark, throughout the questioning of witnesses.**

10        "[A] line of questioning that repeatedly incorporates inadmissible evidence can be just

11  as improper as the direct admission of such evidence." *United States v. Sine*, 493 F.3d 1021,

12  1031 (9th Cir. 2007).  For this reason, it is misconduct for the prosecutor, "under the guise

13  of 'artful cross examination,' to tell the jury the substance of inadmissible evidence." *United*

14  *States v. Sanchez*, 176 F.3d 1214, 1222 (9th Cir. 1999).  Thus, a prosecutor may not ask

15  questions which suggest facts harmful to the defendant, unless he has a good faith belief that

16  he will be able to prove those harmful facts through independent evidence.  *United States v.*

17  *Davenport*, 753 F.2d1460, 1463-1464 (9th Cir. 1985); *United States v. Silverstein*, 737 F.2d

18  864, 868 (10th Cir. 1984).  As the Ninth Circuit explained in *Davenport*:

19        This method of inquiry or cross-examination is frequently
    resorted to by counsel for the very purpose of injuring by
20        indirection a character which they are forbidden directly to
    attack in that way; they rely upon the mere putting of the
21        question (not caring that it is answered negatively) to convey
    their covert insinuation. *Id.* at p. 1463.

22

23        When the prosecutor's questioning references extrajudicial statements that are

24  contained in an absent witness's out-of-court testimonial statement, that conduct also

25  implicates the accused's Sixth Amendment right to confrontation and cross-examination.

26  *Douglas v. Alabama*, 380 U.S. 415, 419 (1965); *Hardnett v. Marshall*, 25 F.3d 875, 876, 880

27  (9th Cir. 1994).  In *Douglas*, for example, two defendants – Douglas and Loyd – were

28  charged, and separately tried, with assault to commit murder.  Out of court, Loyd gave a

1   confession in which he recited details and circumstances of the crime and identified Douglas

2   as the shooter.

3       When called as a hostile prosecution witness at Douglas's trial, Loyd invoked his Fifth

4   Amendment privilege in front of jury. Under the guise of cross-examination, the prosecutor

5   then read from Loyd's out-of-court confession, stopping along the way to ask Loyd if he had

6   made each statement. In each instance, Loyd invoked the Fifth Amendment and declined to

7   answer the question. *Douglas v. Alabama, supra*, 380 U.S. at p. 417. The Supreme Court

8   held that the prosecutor's questioning amounted to a Sixth Amendment confrontation

9   violation since it created a strong inference that Loyd had made the statements and since the

10  veracity of those inferred statement could not be impeached through cross-examination. *Id.*

11  at p. 419.

12      The Ninth Circuit encountered a similar situation in *Hardnett v. Marshall* (9th Cir.

13  1994) 25 F.3d 875. There, the trial court excluded an out-of-court statement by the

14  defendant's girlfriend and co-defendant. While cross-examining the defendant, however, the

15  prosecutor asked if he had "started slapping [his girlfriend] around at Fisherman's Wharf?"

16  *Id.* at pp. 877-878. The defendant denied the allegation and the prosecutor followed up by

17  asking: (1) if his girlfriend would be lying if she told the police he had slapped her around;

18  and (2) if he could explain why his girlfriend would tell the police that he had slapped her

19  around. Later, the prosecutor also asked the defendant if he had stated, "I'm going to get that

20  mother fucker. I got my knife and I'm going to get that now." *Id.* at p. 878. When the

21  defendant denied making this statement, the prosecutor asked if his girlfriend would be lying

22  if she had attributed it to him. *Ibid.* The Ninth Circuit characterized the prosecutor's

23  misconduct as "egregious" and a "clear" constitutional violation. *Id.* at pp. 876, 880.

24      The misconduct here was identical to what took place in both *Douglas* and *Hardnett*.

25  As in those cases, the prosecutor here made the jury aware of otherwise inadmissible, out-of-

26  court statements by framing those statements as questions to petitioner and his brother,

27  Dionte. Moreover, when he asked these questions, the prosecutor knew full well that both

28  petitioner and Dionte would deny them. Indeed, during his opening statement, the prosecutor

1    came right out and told the jury that Dionte would "probably deny" the two girls were being

2    put out on the street for prostitution. (2 RT 169.) The prosecutor knew this to be true

3    because both Dionte and petitioner had already denied such conduct during their post-arrest

4    interviews with the police. (Exh. 16, pp. 8-9; Exh. 17, pp. 12, 15.)

5        Likewise, the prosecutor also acknowledged, at a pretrial hearing, that he had no way

6    of proving the pimping and prostitution allegations since neither Juanita Davis nor Robert

7    Clark would be available to testify at trial. (2 RT 143.) Thus, without any good faith belief

8    that the witnesses would answer the questions in the affirmative – and with the knowledge

9    that he had no way of proving the pimping allegations – the sole purpose in questioning

10   Dionte and petitioner about pimping and prostitution was to insinuate to the jury that the

11   allegations were true. That is the very conduct prohibited by *Douglas* and *Hardnett*.

12       Indeed, the misconduct in *Douglas* and *Hardnett* actually paled in comparison to what

13   happened here. In those cases, the misconduct was brief and relatively isolated. In *Douglas*,

14   the impropriety occurred over the course of 21 questions posed to a single witness; in

15   *Hardnett*, there were only four questions at the heart of the misconduct claim – all of them

16   posed to a single witness. *Douglas v. Alabama, supra*, 380 U.S. at p. 417, fn. 2; *Hardnett*

17   *v. Marshall, supra*, 25 F.3d at pp. 877-878.

18       Conversely, in petitioner's case, there was nothing fleeting or isolated about the

19   misconduct. Rather, it was an almost constant theme throughout the questioning of Dionte

20   and petitioner. In his questions, the prosecutor hit literally every key point from Davis and

21   Clark's statements: that petitioner and Dionte were on International because they were

22   pimping the two girls (3 RT 475-476; 6 RT 861); that the two girls were minors (3 RT 454-

23   455; 6 RT 857-858); that one of the girls eventually got into Nawabi's car (3 RT 476; 6 RT

24   861-862); and that petitioner approached Nawabi's car and twice asked him where the girl

25   was. (4 RT 509; 6 RT 862.) Furthermore, the prosecutor also asked both Dionte and

26   petitioner if they knew Clark and Davis's "version of events" (3 RT 478; 7 RT 955), if they

27   knew what Clark and Davis would have told the police (4 RT 553; 7 RT 955-956), and if

28   they were "afraid" of what Clark would tell the police about what they were doing on

1   International Boulevard. (4 RT 553; 7 RT 955-956.) Such questions left little doubt that the

2   prosecutor was not pulling the pimping allegations out of thin air, but was basing his

3   questions on the information which Clark and Davis had given to law enforcement.

4           Furthermore, the prosecutor did not act out of ignorance or neglect, but out of a willful

5   design to disobey the court's orders. The trial court warned the prosecutor very early in trial

6   that it would not allow him to phrase his questions in a way which presented Juanita Davis's

7   inadmissible statements to the jury. (2 RT 142-143.) Indeed, many of the questions which

8   the prosecutor proposed to ask of Juanita Davis were identical to the ones he eventually

9   asked to both Dionte and petitioner. For example, the prosecutor proposed to ask Davis:

10   whether the two "juvenile girls" were engaging in prostitution on 19th and International;

11   whether she believed that one of the girls had gotten into Nawabi's car; whether she,

12   petitioner, and Dionte followed Nawabi in order to determine if the girl was in his car; and

13   whether petitioner had asked Nawabi, "where's the girl, where's the girl?" (Court's Exh. 3.)

14   The court prohibited these questions – specifically warning the prosecutor against presenting

15   his theory of the case "through your questioning instead of legitimate testimony." (2 RT 142-

16   143.) Yet, the prosecutor went out and blatantly defied the court's order – as well as

17   numerous subsequent admonishments throughout the trial. Such defiance of a court order

18   made the prosecutor's conduct "even more egregious." *United States v. Beeks*, 224 F.3d 741,

19   746 (8th Cir. 2000).

20           Finally, the allegations contained in Clark and Davis's statements were of critical

21   importance to the prosecution's case. See *United States v. Hall*, 989 F.2d 711, 717 (4th Cir.

22   1993). Without the pimping allegations contained in Robert Clark and Juanita Davis's

23   statements, the prosecutor had almost no evidence to explain the motive behind petitioner's

24   shooting of Abdul Nawabi. Absent any demonstrable motive, the jury would have had

25   trouble rejecting petitioner's explanation that he shot Nawabi because he believed Nawabi

26   was reaching for a gun and was about to shoot him. Moreover, even if the jury did reject

27   petitioner's version of events, it could still have harbored a reasonable doubt about the degree

28   of the homicide. Under California law, a defendant commits first degree murder when the

1   killing is willful, deliberate, and premeditated. Pen. Code, § 189. To be willful, deliberate,

2   and premeditated, the killing must be "formed upon a *pre-existing* reflection" and as the

3   result of "careful thought and weighing of considerations." *People v. Anderson*, 70 Cal.2d

4   15, 26 (1968), original italics; see also CALJIC No. 8.20. Absent evidence of a conflict

5   between petitioner and Nawabi, it is difficult to imagine what reflection and consideration

6   would have led petitioner to suddenly shoot a 62-year old man whom he had never met

7   before.

8       By repeatedly asking questions which he had neither the intent nor ability to prove,

9   the prosecutor engaged in severe misconduct, calculated solely to make the jury aware of

10  Clark and Davis's inadmissible testimonial statements to the police. By so doing, the

11  prosecutor violated petitioner's Sixth Amendment rights to confrontation and cross-

12  examination.

13

14  **C.    The prosecutor engaged in misconduct by intentionally trying to elicit inadmissible statements from Bobby McKenzie, Sr. and, when he was unsuccessful, by making physical reference to a transcript of Robert Clark's statement and implying that the statement came from McKenzie, Sr.**

15

16      During cross-examination of petitioner's father, Bobby, Sr., the prosecutor asked

17  about a conversation he had with Robert Clark after Clark came to his house on the morning

18  of the shooting. Specifically, he asked Bobby, Sr. if Clark had told him what "your son

19  Bobby and son Dionte were doing with the two girls?" Bobby, Sr. answered in the negative

20  and the prosecutor followed up by asking if he had told Clark, "[Y]ou shouldn't be doing

21  that, especially out here." When Bobby, Sr. denied making the statement, the prosecutor

22  pulled out a piece of paper and asked if Bobby, Sr. wanted to see a transcript. Defense

23  counsel immediately objected that the transcript did not reflect an interview of Bobby, Sr.,

24  but of someone else. (6 RT 794.)

25      It is misconduct for the prosecutor to intentionally elicit inadmissible testimony.

26  *United States v. Davenport, supra*, 753 F.2d at p. 1463 (9th Cir. 1985); *United States v.*

27  *Johnson*, 127 F.3d 380, 393-395 (5th Cir. 1997). If Bobby, Sr. did indeed tell Robert Clark,

28  "[Y]ou shouldn't be doing that, especially out here," that statement was bald hearsay under

1   California law. See Evid. Code, § 1200 [hearsay is "evidence of a statement that was made

2   other than by a witness while testifying at the hearing and that is offered to prove the truth

3   of the matter stated"]. Thus, the prosecutor committed misconduct by trying to elicit this

4   statement, in stark violation of the California Evidence Code.

5          Moreover, the prosecutor's questioning was also improper for the same reasons as

6   discussed in subsection (B): because its sole purpose was to bring before the jury Robert

7   Clark's allegations that petitioner was pimping the two teenage girls in the hours before the

8   shooting. After all, the statement, "You shouldn't be doing that" carries meaning only if

9   asked in a context in which the jury understands exactly what the proffered statement was

10  alluding to. Here, the prosecutor wanted the jury to infer that the statement, "You shouldn't

11  be doing that" meant "You shouldn't be pimping girls in the International Boulevard area."

12  Indeed, this is the only inference the jury could plausibly have drawn, given the prosecutor's

13  incessant, and less-than-subtle references to the subject.

14         Finally, even if the prosecutor's questioning of Bobby, Sr. was not misconduct, the

15  follow-up surely was. Under California law, an attorney is permitted to use an inadmissible

16  writing in an effort to refresh a witness's recollection. Evid. Code, § 771; *People v. Lee*, 219

17  Cal.App.3d 829, 841 (1990). However, since the writing is hearsay, the party using it may

18  neither read it aloud nor show it to the jury. *Estate of Packer*, 164 Cal. 525, 530 (1913).

19         Here, when Bobby, Sr. denied making the statement which the prosecutor attributed

20  to him, the prosecutor literally announced to the jury that he had a transcript, while

21  simultaneously holding what he represented to be that transcript. Such oral and physical

22  reference to a purported transcript constitutes misconduct, which the Seventh Circuit has

23  characterized as "reprehensible." *United States v. Steele*, 91 F.3d 1046, 1051 (7th Cir. 1996);

24  see also *United States v. Hall*, *supra*, 989 F.2d at pp. 715-716 (4th Cir. 1993). Indeed, the

25  prosecutor's conduct in this case was particularly egregious, in that he not only alluded to a

26  transcript but falsely suggested that the transcript reflected Bobby, Sr.'s own statements. In

27  fact, it reflected Robert Clark's statements – for it was Clark who told the police that Bobby,

28  Sr. said, "[Y]ou shouldn't be doing that, especially out here." (Exh. 18, p. 18.)

- 31 -

1      In short, the prosecutor's improper cross-examination of Bobby, Sr. constituted

2  misconduct and exacerbated his other misconduct – further hammering home the point that

3  Robert Clark had implicated petitioner in pimping and prostitution activities in the hours

4  before the shooting.

5  **D.    The prosecutor engaged in misconduct, and exacerbated his other misconduct, by asking petitioner questions which implied that he had threatened Juanita**

6  **Davis and was behind Davis and Clark's failure to testify.**

7      A prosecutor commits misconduct by advancing an inference which is unsupported

8  by the evidence and which he either knows to be false, or has "very strong reason to doubt."

9  *United States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002).  Such conduct is especially

10  prejudicial when the inference advanced is that the defendant has threatened witnesses.

11  *United States v. Polizzi*, 801 F.2d 1543, 1558 (9th Cir. 1986); *Dudley v. Duckworth*, 854 F.2d

12  967, 970 (7th Cir. 1988) [finding Fourteenth Amendment due process violation].

13      Here, the prosecutor went to considerable lengths to show that Juanita Davis and

14  Robert Clark had implicated petitioner in pimping and prostitution activities in the hours

15  leading up to the shooting – and that petitioner was aware of this fact. (6 RT 867-868; 7 RT

16  955-956.)  Having established these facts, the prosecutor then asked petitioner if he had

17  "threatened Ms. Davis not to testify in this case."  When petitioner responded that he had not,

18  the prosecutor asked if he had "direct[ed] any of your friends to threaten Ms. Davis not to

19  testify in this case." (6 RT 869.)

20      There was not a scintilla of evidence that petitioner had ever threatened Davis, either

21  directly or through a confederate.  Hence, it was clear misconduct for the prosecutor to ask

22  a question which he had no good faith basis to believe true.

23      In addition, the prosecutor also suggested that petitioner was behind both Davis's

24  decision not to testify and Clark's decision to avoid process.  During cross-examination of

25  petitioner, the prosecutor asked petitioner if he knew about Davis and Clark's statements to

26  the police (7 RT 955); if he knew about Davis and Clark's taped statements to defense

27  counsel (6 RT 868); if he drove Davis or Clark to defense counsel's office (6 RT 867); if he

28  had anything to do with either's decision not to testify (7 RT 956); and if Davis had sat with

- 32 -

1  his family during a previous court appearance. (6 RT 869.) Stymied in his efforts to

2  establish these points, the prosecutor ultimately decided to take matters into his own hands

3  and testify himself. After petitioner denied that Davis had sat with his family during previous

4  court appearances, the prosecutor responded, "Mr. McKenzie, I was in the courtroom." (6

5  RT 869-870.)

6      Likewise, while questioning Dionte, the prosecutor badgered Dionte as to whether he

7  was aware of what Robert Clark had told the police – implying, at one point, that Dionte tried

8  "to prevent the police from knowing about Robert Clark" out of fear that Clark "would tell

9  the police about what you guys were doing with the two girls out on International

10  Boulevard." (3 RT 478; 4 RT 553.) Besides yet again violating the rule against asking

11  questions solely to bring facts before the jury, the prosecutor's line of "questions" also

12  implied that petitioner had a motive for suppressing Clark's testimony. They, thus, further

13  fed into the idea – suggested by the prosecutor's other questions – that petitioner may have

14  had something to do with Clark's unavailability.

15      1.  *The procedural default rule does not prevent this Court from addressing*
        *whether the prosecutor committed misconduct by implying that petitioner had*
16       *threatened witnesses or was behind their unavailability for trial.*

17      While the Court of Appeal addressed petitioner's other prosecutorial misconduct

18  claims on their merits, it found that, by failing to object, defense counsel waived the right to

19  challenge the prosecutor's improper insinuations that petitioner had threatened Juanita Davis

20  and was behind Davis and Clark's unavailability for trial. (Opinion, pp. 14-15, fn. 5.) For

21  reasons explained herein, the Court's finding was insufficient to trigger the procedural

22  default rule.

23      To the extent that the last reasoned state court decision (or a portion of that decision)

24  rests on "adequate and independent state grounds," the decision (or portion thereof) is not

25  reviewable by way of a federal habeas petition. *Michigan v. Long*, 463 U.S. 1032, 1042-

26  1043 (1983); *Ylst v. Nunnemaker*, 501 U.S. 797, 803-804 (1991). A state procedural bar is

27  "adequate" if it is "firmly established," "regularly followed," and "consistently applied."

28

1    *Ford v. Georgia*, 498 U.S. 411, 423-424 (1991); *Collier v. Bayer*, 408 F.3d 1279, 1283-1284

2    (9th Cir. 2005).

3        Under California law, a contemporaneous objection is required in order to preserve

4    appellate claims based on evidentiary errors or prosecutorial misconduct. Evid. Code, § 353

5    [evidentiary errors]; *People v. Jones*, 53 Cal.3d 1115, 1144 (1991) [prosecutorial misconduct

6    claims]. Here, defense counsel did object – not just once, but numerous times – to the

7    prosecutor's improper insinuations that petitioner had threatened Davis and was behind Clark

8    and Davis's unavailability. For instance, after the prosecutor asked petitioner a series of

9    questions suggesting that he had driven Clark and Davis to defense counsel's office, or

10   arranged for them to give statements at the office, defense counsel objected on the grounds

11   that the questions "all assum[ed] facts not in evidence." Moments later, the prosecutor asked

12   if petitioner was aware that Juanita Davis "gave a taped statement at your attorney's office?"

13   Defense counsel again objected and requested that the prosecutor be admonished. Later,

14   defense counsel objected when the prosecutor asked petitioner if he was "surprised" when

15   Juanita Davis refused to testify at trial. The trial court addressed each of defense counsel's

16   objections – sustaining two of them – but the Court of Appeal nonetheless found the issue

17   waived. (6 RT 867-871.)

18       In *Melendez v. Warden*, 288 F.3d 1120, 1125 (9th Cir. 2002), the Ninth Circuit

19   refused to apply the procedural default rule where defense counsel objected, but the trial

20   court declined to consider the objection. The Court found that, while California appellate

21   courts have consistently applied the waiver doctrine when defense counsel makes no

22   objection at all, there is no consistently applied California rule when defense counsel objects,

23   but the trial court fails to address the objections. *Id.* at pp. 1125-1126. The same logic is true

24   here, as there is no consistently applied California rule by which appellate courts have

25   applied the waiver doctrine despite defense counsel's repeated objections. As the Court of

26   Appeal's forfeiture finding did not arise from any firmly established, regularly followed, and

27   consistently applied California law, the procedural default rule does not apply.

28

- 34 -

1     Furthermore, while the California courts have consistently required a

2   contemporaneous objection in order to address evidentiary errors on their merits, the same

3   is not true of prosecutorial misconduct claims. To the contrary, even in the absence of any

4   objection, California appellate tribunals retain discretion to resolve prosecutorial misconduct

5   claims on their merits. See, e.g., *People v. Hill*, 17 Cal.4th 800, 821 (1998); *People v.*

6   *Williams*, 17 Cal.4th 148, 161, fn. 6 (1988). Accordingly, California's contemporaneous

7   objection requirement is not adequate to bar federal review of a defendant's constitutional

8   claim.

9     Finally, to the extent this Court finds that the procedural default rule prevents

10  petitioner from presenting his claim that the prosecutor committed misconduct by implying

11  that he had threatened or procured the disappearance of witnesses, it may nonetheless

12  consider the prosecutor's insinuations insofar as they exacerbated the effect of his other

13  misconduct. By implying that petitioner was behind Davis and Clark's unavailability, the

14  prosecutor further brought home the point that Davis and Clark would have implicated

15  petitioner in pimping activities in the hours before the shooting. After all, why else would

16  petitioner have wanted to procure their disappearance?

17    Because there was no evidence to support the inference that petitioner had threatened

18  or influenced Davis or Clark into absenting themselves from trial, it was misconduct for the

19  prosecutor to make these insinuations.

20

**E.   The prosecutor engaged in misconduct, and exacerbated his earlier misconduct,**

21  **by citing his own improper insinuations during closing argument.**

22    It is axiomatic that an attorney's questions are not evidence. Model Criminal Jury

23  Instructions (9th Cir. 2003 ed.), No. 1.4; *People v. Rios*, 163 Cal.App.3d 852, 868-869

24  (1985). A prosecutor, thus, commits misconduct when he suggests otherwise, and asks the

25  jury to treat his unanswered questions as evidence.

26    Six times during closing argument, the prosecutor reminded the jurors that Juanita

27  Davis and Robert Clark didn't testify at trial. (7 RT 1085, 1092-1093; 8 RT 1195-1197.) He

28  also reminded the jurors that, even though they hadn't heard from Clark or Davis, they had

1   "heard my questions of the defendant" and "obviously [knew] my theory of the case." (7 RT

2   1085.) The prosecutor then went through each of the questions he had asked petitioner about

3   prostitution – each time reminding the jury that petitioner had denied the question. (7 RT

4   1092-1093.) The purpose of the prosecutor's arguments was to convey the message: (1) that

5   the allegations contained in his questions were true; (2) that the allegations were based on

6   Clark and Davis's out-of-court statements; and (3) that petitioner was lying when he denied

7   the questions posed to him.

8          Later, the prosecutor dropped numerous additional hints about the pimping and

9   prostitution activities that he believed led up to the shooting. For instance, he pointed out

10  that the Explorer arrived in Oakland between 10:00 and 11:00 but that petitioner could not

11  account for what he was doing for the two to three hours before the shooting. (7 RT 1094-

12  1095.) He also used the tactic of juxtaposing what he characterized as Dionte's truthful

13  admissions, with his denials of prostitution activities. For example, the prosecutor conceded

14  that Dionte was being "honest about the Explorer stopping on International Boulevard near

15  19th Avenue," but he immediately qualified Dionte's honesty with the caveat that, "He just

16  won't say anything about prostitution." Moments later, the prosecutor used the same

17  technique again, stating that Dionte admitted the girls were standing in the prostitution-heavy

18  area of 19th and International, but "he denies they were prostituting." The prosecutor then

19  repeated this tactic for a third time, comparing Dionte's truthful admission "that his brother

20  went after the victim" with his denial that "it's over prostitution." (7 RT 1099.) The

21  unmistakable implication of this argument was that, if Dionte were being **fully** honest, he

22  would have admitted the prostitution allegations, as well.

23         By the time of his rebuttal argument, the prosecutor had abandoned any pretense of

24  subtlety – instead coming right out and practically announcing that Robert Clark and Juanita

25  Davis were the source of the pimping and prostitution allegations. At one point, for example,

26  he cited Sergeant Longmire's testimony that, despite the lack of any criminal record, Dionte

27  was something less than squeaky clean. (8 RT 1194-1195; see 4 RT 721-722.) The

28  prosecutor next reminded jurors that Longmire – unlike the jurors themselves – had the

- 36 -

1 advantage of "hear[ing] from all the witnesses in the case," including not only those who

2 testified at trial but also Robert Clark and Juanita Davis. He then argued that, based on what

3 these "witnesses" had told him, Longmire formed the opinion that Dionte was engaged in

4 criminal activity "that night." (8 RT 1194.) Taken in combination with the prosecutor's

5 numerous questions and comments about pimping and prostitution, no juror could seriously

6 have doubted that the criminal activity was pimping and that Davis and Clark were the source

7 of those allegations.

8         In a hollow effort to justify his constant references to Robert Clark and Juanita Davis,

9 the prosecutor tried to characterize the two as logical witnesses whom the defense should

10 naturally have called to explain what he was doing with the two girls on International

11 Boulevard. (8 RT 1195-1197.) Petitioner is at a loss as to why he needed to explain what

12 he was doing on International Boulevard, when there was no evidence he was doing anything

13 nefarious. In any case, petitioner **did** explain what he was doing on International Boulevard.

14 Both he and Dionte testified that they were in the area because Robert Clark had a cousin

15 who lived nearby. (3 RT 470; 6 RT 860; 7 RT 949.) Petitioner had no need to call additional

16 witnesses to rebut evidence that he was engaged in pimping because there was, quite simply,

17 no such evidence. A prosecutor may not inject an issue into the case through his own

18 improper questions, then turn around and blame the defense for failing to rebut the inference

19 raised by those questions.

20         As a final matter, it bears mention that, during the prosecutor's rebuttal argument, the

21 court sustained four separate defense objections on the grounds that: (1) the defense had no

22 duty to call witnesses; and (2) the argument asked the jury to speculate about what Clark and

23 Davis would have said. Twice, the court specifically admonished the prosecutor to move on

24 to a new subject area – yet, each time, the prosecutor disregarded these admonishments and

25 immediately returned to the identical argument. (8 RT 1195-1197.)

26         Simply put, the prosecutor committed egregious misconduct during closing argument

27 – repeatedly asking the jury to speculate about facts not in evidence and repeatedly asking

28 the jury to draw inferences based on nothing more than his own improperly asked questions.

1  By so doing, the prosecutor violated petitioner's Sixth Amendment right to confrontation and

2  his Fourteenth Amendment due process rights.

3  **F.    Because the prosecutor's misconduct infected the trial with unfairness, and had a substantial and injurious effect on the jury's verdict, petitioner's conviction and punishment must be set aside.**

4

5      A prosecutor's misconduct violates the Fourteenth Amendment's due process clause

6  and requires reversal where it "infect[s] the trial with unfairness." *Donnelly v.*

7  *DeChristoforo*, 416 U.S. 637, 643 (1974). Where, as here, the misconduct also implicates

8  the defendant's Sixth Amendment confrontation rights, habeas relief must be granted if the

9  misconduct had a "substantial and injurious effect" on the jury's verdict. *Brecht v.*

10  *Abrahamson*, 507 U.S. 619, 623 (1993).

11      The misconduct here was repeated, egregious, and involved multiple witnesses. Most

12  important of all, the misconduct went toward a critical issue in the case, enabling the

13  prosecutor to plant the idea that petitioner chased after and shot Abdul Nawabi because one

14  of the two juvenile girls, whom petitioner had put out on the street for prostitution, had gotten

15  into Nawabi's car and disappeared. Without this insinuation, there was scant, if any,

16  evidence to show that petitioner had a motive for shooting Nawabi. Indeed, the prosecutor

17  essentially acknowledged the complete absence of motive evidence – for he specifically

18  argued that motive was irrelevant to petitioner's guilt (an argument which was legally false).

19  (8 RT 1189.)

20      Even more than supplying a motive, the pimping and prostitution insinuations gave

21  the prosecutor's case a coherence and context which the evidence itself failed to provide.

22  The prosecution presented no evidence that petitioner went to Oakland with a plan to kill

23  Abdul Nawabi. Petitioner testified that he had never met Nawabi before the night of the

24  shooting (6 RT 831), and there was no evidence to contradict this statement. Under such

25  circumstances, it makes no sense that petitioner would have killed Nawabi willfully,

26  deliberately, and with premeditation.

27      Furthermore, the presence of a motive not only bore on the issue of premeditation but

28  also the presence or absence of malice. This is particularly true in this case since petitioner's

claim of self-defense could easily have been construed as an actual but unreasonable attempt to defend himself – a scenario which vitiates malice, and reduces murder to voluntary manslaughter under California law. *People v. Flannel*, 25 Cal.3d 668, 679-680 (1979); CALJIC No. 8.40. The pimping allegations directly undercut such an outcome, since they created a reason, having nothing to do with self-defense, why petitioner may have decided to shoot Nawabi.

It is also worth noting that the prosecutor did not merely bring in Juanita Davis and Robert Clark's out-of-court testimonial statements; he did so selectively. Whatever Davis may have told the police about petitioner's pimping activities and about the events leading up to the shooting, she also corroborated petitioner's claim that, in the moments before the shooting, Nawabi was yelling at him and reaching for his glove compartment. (Exh. 15, p. 9.) The prosecutor, of course, omitted this portion of Davis's statement from the questions he asked of petitioner and Dionte. And, since defense counsel chose not to engage in the same improper tactic of including Davis's inadmissible statements in the factual predicates of his questions, the jurors only got to learn the most damaging aspects of her statements, but not the exculpatory parts. Had the jury heard all of Juanita Davis's statement – instead of just the portions the prosecutor chose to present to them – they would have been **more** likely, not less likely, to accept petitioner's self-defense claim.

Several additional factors exacerbated the misconduct's prejudicial effect. First, the prosecutor relied on his own improper questioning throughout his closing argument. *People v. Blackington*, 167 Cal.App.3d 1216, 1223 (1985); see also *Hardnett v. Marshall, supra*, 25 F.3d at p. 879 (9th Cir. 1994) [implicitly recognizing that improper questioning is magnified when prosecutor relies on it during closing argument]. Second, the prosecutor not only made physical reference to Robert Clark's out-of-court statements, but also falsely implied that the statements came from petitioner's father, Bobby, Sr. *United States v. Steele*, 91 F.3d 1046, 1051 (7th Cir. 1996); see also *United States v. Hall*, 989 F.2d 711, 715-716 (4th Cir. 1993). Third, the jury was especially likely to give weight to Juanita Davis's out-of-court statements, since they came from petitioner's girlfriend – a person who would be unlikely to falsely

implicate him in pimping and prostitution activities. *Hall*, at p. 917 [finding that jury would give more weight to extrajudicial statements of defendant's spouse]. Fourth, the prosecutor's improper cross-examination was not directed at an insignificant witness; it was directed at petitioner himself. In *Hall*, the Fourth Circuit drew a distinction between these two situations, finding that the latter situation was, by far, the more prejudicial. *Hall*, at p. 917.

Finally, not only did the prosecutor's misconduct inject a motive and context into the case that didn't otherwise exist on the face of the record; it also stained petitioner's character by creating the inference – not present in the evidence – that he was taking underage girls out of school and pimping them on the streets of Oakland. The injection of inadmissible character evidence into a case, through the improper questioning of witnesses, has been repeatedly held to be reversible error in and of itself. *United States v. Davenport, supra*, 753 F.2d at p. 1463 (9th Cir. 1985); *United States v. Beeks, supra*, 224 F.3d at p. 747 (8th Cir. 2000); *United States v. McPhee*, 731 F.2d 1150, 1153 (5th Cir. 1984); *United States v. Cudlitz*, 72 F.3d 992, 1000 (1st Cir. 1996).

In short, without the prosecutor's improper insinuations, the jury could have harbored a reasonable doubt as to whether petitioner acted with premeditation or malice in shooting Abdul Nawabi. As the prosecutor's misconduct infected the trial with unfairness, and had a substantial and injurious effect on the jury's verdict, the habeas relief should be granted.

**G.      The Court of Appeal erred by finding the misconduct to be harmless beyond a reasonable doubt.**

In its August 1, 2007 decision, the California Court of Appeal agreed that "the prosecutor engaged in a troubling and extensive pattern of misconduct" which violated petitioner's Sixth Amendment confrontation rights. (Court of Appeal Opinion, pp. 1, 7, 13.) However, it nonetheless found the error harmless beyond a reasonable doubt. (Opinion, pp. 13-14.) In finding the error harmless, the Court concluded: (1) that the jury would have likely inferred petitioner's involvement in prostitution even without the prosecutorial misconduct; and (2) that the evidence of guilt was "overwhelming." In addition, the Court also emphasized that the jury was specifically instructed to not treat an attorney's questions

- 40 -

1    and statements as evidence. (Opinion, pp. 13-14.) The Court of Appeal's findings were far

2    off-base.

3            1.    *The properly admitted evidence did not remotely support an inference that*

            *petitioner was engaged in pimping and prostitution – let alone that such*

4                *pimping activities were what gave rise to the shooting.*

5          In finding the prosecutorial misconduct harmless, the Court of Appeal found that,

6    even without the improper questioning and argument, the jury would "certainly have drawn

7    the inference of [petitioner's] involvement in prostitution," based on the evidence that

8    petitioner took two girls to a high prostitution area late at night; that the defense never

9    explained the two girls' disappearance; and that a video camera found in the back seat of

10   Robert Clark's car depicted "pimps and prostitutes." (Opinion, p. 14.)

11         Petitioner is at a loss as to how the cited evidence could plausibly support an inference

12   that he was putting the two girls on the street to be prostitutes - let alone an inference that the

13   jury would "certainly" have drawn. But he will not belabor the point. It is enough to say that

14   it wasn't the prostitution activities which explained why the shooting occurred. It was the

15   chain of events arising out of those prostitution activities – namely, the fact that one of the

16   two girls got into the car with Abdul Nawabi and disappeared, prompting petitioner to follow

17   after Nawabi, shouting, "Where's the girl?  Where's the girl?"  Even if the evidence

18   suggested that petitioner was putting the two girls on the street for prostitution, it did not

19   remotely support the inference that any of the follow-up events occurred.

20         Moreover, the prosecutor did not ask the jurors to infer petitioner's prostitution

21   activities from the properly admitted evidence. During his closing arguments, the prosecutor

22   made only passing reference to the videotape, and that was only to point out that it

23   corroborated the statements made by Robert Clark – the very same statements that were never

24   admitted into evidence in the first place. (8 RT 1195-1196.) Not once during his closing

25   arguments did the prosecutor ever attempt to piece together the evidence which showed that

26   petitioner was putting the two girls on International Boulevard to be prostitutes. Quite

27   conversely, he mentioned Juanita Davis and Robert Clark's out-of-court statements numerous

28   times. (7 RT 1085, 1092-1095, 1098-1100; 8 RT 1194-1195.)

1   By finding that the properly admitted evidence gave rise to an inference of

2   prostitution-related activities, the Court of Appeal injected a whole new theory into the case

3   – one which the prosecutor never presented to the jury.  It then found beyond a reasonable

4   doubt that the jury would still have reached the same verdict under this alternative theory.

5   The Court's analysis misapplied the directive of *Sullivan v. Louisiana*, 508 U.S. 275 (1993).

6   *Sullivan* makes clear, that in analyzing whether a federal constitutional error was harmless,

7   the reviewing court must ask, not whether the jury would have surely rendered a guilty

8   verdict in an error-free trial, but "whether the guilty verdict actually rendered in *this* trial was

9   surely unattributable to the error."  *Id.* at p. 279.  Differently put, the question is not whether

10  "the jury considered evidence from which it could have come to the verdict without reliance

11  on the [prosecutorial misconduct]." *Yates v. Evatt*, 500 U.S. 391, 404 (1991).  The question

12  is whether **this** jury "actually rested its verdict" on evidence independent of the improperly

13  injected facts.  *Ibid.*  Without spilling needless ink, how could the jurors have actually rested

14  their verdict on a theory which the prosecutor never presented?  And how could they have

15  ignored a theory which the prosecutor bombarded them over the head with?  Quite simply,

16  it didn't happen.

17
        2.    *The evidence of willful, deliberate, and premeditated murder was far short of*
18           *overwhelming.*

19  In finding the prosecutor's misconduct harmless, the Court of Appeal also cited the

20  "overwhelming" evidence of petitioner's guilt.  In doing so, however, it completely failed

21  to address any distinction between evidence going toward the issue of guilt, and evidence

22  bearing on the degree of homicide.  Indeed, the Court actually treated any such distinction

23  as though it didn't matter, noting that the shooting itself was undisputed; "the only question

24  was whether this was an accident or a case of reasonable or unreasonable self-defense."

25  (Opinion, p. 14.)  In fact, those are rather significant questions, whose answers could either

26  have provided a complete defense to the charges or, at the very least, reduced the charge

27  from first degree murder to voluntary manslaughter.  Yet, the Court completely failed to

28

1  address the significant bearing which the pimping and prostitution allegations may have had

2  on the degree of the homicide.

3       Rather than addressing how the pimping and prostitution allegations might have

4  established a motive for the offense, the Court of Appeal instead came up with an alternate

5  motive: that petitioner shot Nawabi because – in Dionte's words – Nawabi had been "talking

6  shit" to him during their initial encounter. (Opinion, pp. 3, 14; 4 RT 529-530; Exh. 16A, p.

7  4.)  Given the presence of one plausible motive for the shooting, the Court of Appeal

8  concluded that it was only "tangentially relevant" whether the encounter arose from that

9  motive or from "a trick gone awry." (Opinion, p. 14.)

10      What the Opinion failed to mention, however, is that the prosecutor specifically

11  disavowed the very theory on which the Court rested its harmless error analysis. During his

12  closing argument, the prosecutor observed that Dionte had provided a potential motive when

13  he told the police that Nawabi had been "talking shit" to petitioner. However, in the very

14  next sentence, the prosecutor added, "I'm not going to argue that because I don't feel that I

15  could argue that in good faith." (8 RT 1189.)

16      One might well imagine how the Court of Appeal would have responded if the

17  defense had sought reversal due to an omitted jury instruction, on a theory which defense

18  counsel had specifically disavowed during closing argument. Undoubtedly, the Court would

19  have cited counsel's closing argument as one of the primary reasons why the error was

20  harmless beyond a reasonable doubt. Yet, here the Court did just the opposite – finding it

21  beyond a reasonable doubt that the jurors actually relied on a theory that the prosecutor

22  specifically told them not to rely on.

23      The Court of Appeal also placed considerable emphasis on Dorialynn Butcher's

24  testimony about "a purposeful, execution style shooting." (Opinion, p. 14.)  Butcher,

25  however, only witnessed the encounter's denouement. She was not in a position to hear

26  whether Nawabi had threatened to kill petitioner, and she knew nothing about the events

27  leading up to the shooting. Her testimony, thus, did not speak to the issue of premeditation

28

1   and deliberation, and it did not speak to the issue of whether petitioner was acting out of a

2   genuine belief in the need for self-defense – reasonable or otherwise.

3          Moreover, just because Butcher was "the only uninvolved eyewitness" does not mean

4   her version of events was unassailable. (Opinion, p. 14.) Indeed, there is good reason to

5   question Butcher's attention to detail, for she admitted that she was talking to a friend on her

6   cell phone at the time the shooting unfolded. (2 RT 226, 269-260.) Furthermore, Butcher's

7   trial testimony conflicted with her preliminary hearing testimony on a critical point. At trial,

8   she testified that petitioner jumped out of his car, shot Nawabi, then immediately got back

9   into his car. (Opinion, p. 2; 2 RT 233-235.) During the preliminary hearing, however, she

10   testified that about 30 seconds passed between the time petitioner jumped out of the Explorer

11   to the time she heard the gunshot. (2 RT 257.) 30 seconds would be more than enough time

12   for the entire sequence of events described by petitioner to have unfolded: that is, petitioner

13   getting out of the car and asking Nawabi if something was wrong; Nawabi becoming angry,

14   threatening to kill petitioner, and reaching toward the passenger's side of his car; and

15   petitioner backing away from Nawabi, then pulling out his gun and firing. (3 RT 836-841.)

16          The Court of Appeal also failed to address how the jury might have assessed

17   Butcher's testimony had it been completely oblivious to what Juanita Davis and Robert Clark

18   had told the police. Butcher described a shooting at point-blank range, within no more than

19   30 seconds after petitioner had exited his car. But such facts are not necessarily inconsistent

20   with a claim of self-defense (reasonable or otherwise). Davis and Clark's statements gave

21   context to Butcher's testimony, by providing a motive and explanation to go with the point-

22   blank shooting. Without these out-of-court statements, the evidence showed literally only

23   one version of the events leading up to the shooting: the defense version. While the jury was

24   free to reject the defense's account, there is a considerable leap from rejecting the defense's

25   explanation to finding, beyond a reasonable doubt, that, despite the complete absence of

26   motive evidence, the prosecution had proved its case of willful, deliberate, and premeditated

27   murder. There is no way to know whether the jurors would have made this leap because, as

28

1   a result of the prosecutor's misconduct, they never had to make it.  The problem with the

2   Court's harmless error analysis is that it simply made the leap for them.

3          3.    *The trial court's instructions did not cure the prosecutorial misconduct.*

4          Finally, the Court of Appeal found the prosecutorial misconduct harmless because the

5   trial court instructed the jury that a question was not evidence, that it should not assume a

6   question's insinuations to be true, and that it should decide the case based on the evidence

7   actually presented.  (Opinion, p. 14.)

8          Regardless of the trial court's instructions, there comes a point where it is impossible

9   for the jury to "unring a bell."  *People v. Hill, supra,* 17 Cal.4th at p. 845.  For this reason,

10  numerous appellate courts have found curative instructions insufficient to cure prosecutorial

11  misconduct that was far less pervasive than what happened here.  *United States v. Davenport,*

12  *supra,* 753 F.2d at p. 1463 (9th Cir. 1985); *United States v. Simtob,* 901 F.2d 799, 806 (9th

13  Cir. 1990); *United States v. Hall, supra,* 989 F.2d at p. 717 (4th Cir. 1993); *United States v.*

14  *Cudlitz, supra* 72 F.3d at pp. 999-1000 (1st Cir. 1996); *People v. Hill, supra,* 17 Cal.4th at

15  pp. 845-846.  The Court of Appeal should have done the same.  Instead, it imagined an error-

16  free retrial which never happened, then reweighed the evidence at that hypothetical trial and

17  found that it was "overwhelming."  The end result is that, "the wrong entity [has] judge[d]

18  [petitioner] guilty."  *Sullivan v. Louisiana, supra,* 508 U.S. at p. 281.

**II.**

**Defense Counsel Provided Ineffective Assistance, in Violation of the Sixth Amendment, by Failing to Adequately Object When the Prosecutor Implied That Petitioner Had Threatened Juanita Davis and Was Behind Davis and Robert Clark's Unavailability for Trial.**

23         During his state court appeal, petitioner argued that, in the event the Court of Appeal

24  found any aspect of his prosecutorial misconduct claims waived due to a failure to object, the

25  failure was the product of ineffective assistance of counsel, in violation of the Sixth

26  Amendment.  The Court of Appeal found the issues adequately preserved and resolved them

27  on their merits – with but one exception:  it found that petitioner had forfeited his right to

28  challenge the prosecutor's improper insinuation that he had threatened witnesses and was

- 45 -

1   responsible for Juanita Davis and Robert Clark's unavailability at trial. (Opinion, pp. 14-15,

2   fn. 5.) Petitioner addresses only this aspect of the Court of Appeal's finding – and he does

3   so briefly.

4        To the extent that petitioner is barred from challenging the prosecutor's improper

5   implications that he had threatened witnesses or procured their disappearance, defense

6   counsel's failure to adequately object to those implications constituted ineffective assistance

7   of counsel, in violation of the Sixth Amendment. To demonstrate a violation of the Sixth

8   Amendment right to effective counsel, the accused must first show that trial "counsel's

9   representation fell below an objective standard of reasonableness . . . under prevailing

10  professional norms." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). He must then

11  demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result

12  of the proceeding would have been different." *Id.* at p. 694.

13       Here, there was no plausible tactical reason for failing to adequately object to

14  questions which suggested that petitioner had threatened witnesses or was behind their

15  decisions to absent themselves. Moreover, defense counsel's own actions belie any possible

16  tactical motive for his lack of adequate objections. As noted in section (I)(D)(1), *supra*, pp.

17  33-35, defense counsel did object to some of the questions in which the prosecutor implied

18  that petitioner was responsible for Davis and Clark's non-appearance at trial. Having

19  objected to some of the questions, there is no rational explanation as to why counsel would

20  not have objected to all of them, or under the proper basis. His failure to do so was

21  ineffective assistance of counsel which, in combination with the other prosecutorial

22  misconduct, was prejudicial to petitioner.

23  \\

24  \\

25  \\

26  \\

27  \\

28  \\

### III.

**The Trial Court Violated Petitioner's Sixth and Fourteenth Amendment Rights to a Jury Verdict Based on the Evidence Presented at Trial by Refusing to Grant an Evidentiary Hearing to Determine If the Jury Engaged in Prejudicial Misconduct During Deliberations.**

After trial, petitioner moved for an evidentiary hearing to determine if the jury engaged in misconduct during deliberations. In support of that motion, petitioner included a declaration from a defense investigator, detailing post-verdict discussions with four jurors. During those conversations, the jurors made clear that they believed petitioner was engaged in pimping activities; that they believed Robert Clark and Juanita Davis had told the police about these pimping activities; and that they believed it was the defense which had prevented them from hearing the out-of-court statements made by Clark and Davis. Moreover, the investigator's declaration also showed that, according to three separate jurors, the jury consulted a dictionary on more than one occasion -- possibly looking up terms relating to premeditation and intent.

As such facts demonstrated a strong possibility that juror misconduct occurred on an issue which was of critical importance to the case, the trial court abused its discretion by denying petitioner's request for an evidentiary hearing.

#### A.    Background

After the verdict, petitioner filed a motion for access to juror identifying information. (2 CT 442-449.) Upon receiving notice of the motion, 10 jurors responded that they did not want their identifying information released. (2 CT 462; RT [Oct. 20, 2005]: 1214.) The court permitted defense counsel to make contact with only the remaining two. (2 CT 462.) On December 7, 2005, the court ruled that defense counsel could still make contact with the other 10 jurors, provided he could obtain their contact information from legal, public sources. (9 RT 1217.)

On January 13, 2006, petitioner filed a request for an evidentiary hearing on the grounds that the jury speculated into facts not in evidence and consulted a dictionary for the meaning of terms. (Defense Mot. for New Trial, pp. 13-16, 18-19, 25-27.) The motion

- 47 -

1    included a sworn declaration from investigator Patricia de Larios Peyton, in which she

2    detailed her post-verdict interviews with Jurors 6, 7, and 8, as well as her unsuccessful efforts

3    to contact four other jurors.  On January 19, Peyton filed a supplemental declaration, in

4    which she added further detail about her interviews, while also making brief mention of a

5    fourth interview – with Juror 1 – conducted by her associate. (Peyton Supp. Decl.) The facts

6    set forth in Peyton's declarations will be discussed as they become relevant to the arguments

7    which follow.

8        The trial court denied petitioner's request for an evidentiary hearing, ruling that, even

9    if the jury improperly speculated into petitioner's pimping activities, that speculation could

10   not have affected its determination regarding the degree of homicide.  (9 RT 1233-1235.)

11

12   **B.    The trial court abused its discretion, and violated petitioner's Sixth and
         Fourteenth Amendment rights, by failing to grant petitioner's request for an
13       evidentiary hearing to determine if the jury improperly relied on facts not in
         evidence.**

14       It is well-established that juror misconduct during deliberations implicates the

15   accused's constitutional rights of confrontation, cross-examination, and the assistance of

16   counsel, as guaranteed by the Sixth and Fourteenth Amendments. *Jeffries v. Wood*, 114 F.3d

17   1484, 1490-1492 (9th Cir. 1997); *Marino v. Vasquez*, 812 F.2d 499, 505 (9th Cir. 1987).

18   More specifically, where the jury considers facts not in evidence, it violates the accused's

19   Sixth Amendment rights to confrontation and to a jury verdict based on the evidence

20   presented at trial. *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000); *Jeffries v. Wood*,

21   *supra*, 114 F.3d at p. 1490-1492 (9th Cir. 1997); *Marino v. Vasquez*, *supra*, 812 F.2d at p.

22   505.

23       Here, Jurors 7 and 8 both told the defense investigator that there was a "consensus"

24   among the jury that petitioner was engaging in pimping activities.  (Peyton Supp. Decl., ¶¶

25   7(b), 8(d) & 9(c)-(e).)  Likewise, Juror 6 told the investigator that it was "obvious" from the

26   prosecutor's questioning that both Clark and Davis had implicated petitioner in pimping

27   activities.  (*Id.* ¶ 9(c).)  Juror 6 further opined that some of the jurors' perceptions might have

28   changed "had the incident happened when [petitioner] was on his way to church, as opposed

1  to while he was engaged in pimping and prostitution." (*Id.* ¶ 9(e).)  A fourth juror, Juror 1,

2  told the investigator that she was "very aware of the questions asked by the DA which

3  implied that there was pimping and prostitution." (*Id.* ¶ 10.)

4      Moreover, Jurors 6, 7, and 8 all expressed consternation that they had been prevented

5  from hearing Clark and Davis's interviews, which they unanimously agreed would have

6  implicated petitioner in pimping activities. (*Id.* ¶¶ 7(c)-(f), 8(d) & 9 (c)-(d).)  Juror 7 stated

7  that she was "certain" of this fact (*Id.* ¶ 7(c)), while Juror 6 said that it was "obvious" the out-

8  of-court statements contained evidence of prostitution activities. (*Id.* ¶9(c).)  Similarly, Juror

9  8 said the Clark and Davis interviews were "probably damning" and that the jurors were

10  "sure" petitioner was engaged in prostitution.  (*Id.* ¶ 8(d).)  All three jurors blamed the

11  defense for keeping this evidence from them.  (*Id.* ¶¶ 7(c)-(d), 8(d), 9(d).)

12      Based on the showing contained in the investigator's declaration, the trial court

13  abused its discretion by failing to order an evidentiary hearing to determine whether the jury

14  committed misconduct by relying on facts not in evidence concerning the contents of Clark

15  and Davis's interviews.  See CALJIC No. 1.02 ["Do not assume to be true any insinuation

16  suggested by a question asked a witness.  A question is not evidence and may be considered

17  only as it helps you to understand the answer"]; CALJIC No. 1.03 ["You must decide all

18  questions of fact in this case from the evidence received in this trial and not from any other

19  source"].  Given the constraints under which the defense was operating, an investigator's

20  declaration was the best available means for putting the jury misconduct claims before the

21  court.  Cf. *Conaway v. Polk*, 453 F.3d 567, 578-579, 589 (4th Cir. 2006) [where actual

22  witnesses were uncooperative, counsel's declaration constituted sufficient showing of juror

23  misconduct to warrant evidentiary hearing in federal habeas proceeding].)  Yet, the trial court

24  not only refused to release the contact information for 10 of the 12 jurors but, originally, it

25  wouldn't even permit the defense to contact those jurors at all.  Even when the defense did

26  later make contact with jurors, most remained reluctant to cooperate with the defense

27  investigator. (Peyton Supp. Decl., ¶ 5.)  Of the few who granted the investigator an initial

28  interview, one could not be located for a follow-up and another left town without providing

1    a new address.  A third juror, who was "friendly and forthcoming" during the initial

2    interview, later turned uncooperative after speaking with the prosecutor. (*Id.* ¶ 6.)

3        Moreover, the facts set forth in Peyton's declaration were compelling, in that the

4    accounts given by Jurors 6, 7, and 8 were remarkably consistent with each other.  Likewise,

5    Juror 1 also confirmed that she could not help but be aware of the insinuations raised by the

6    prosecutor's questioning.  It would be one thing if a single juror had told the investigator that

7    the jury relied on facts not in evidence.  But it is not so easy to dismiss an allegation which

8    is made by four separate jurors.

9        Finally, the prosecutor's own misconduct lends additional credence to petitioner's

10    showing of juror misconduct.  After all, why wouldn't the jury consider facts which the

11    prosecutor himself made an almost constant theme throughout the trial?  The jurors'

12    statements to Peyton only confirmed the obvious:  that Clark and Davis's extra-evidentiary

13    allegations of pimping and prostitution played a significant role in the adjudication of

14    petitioner's guilt.

15        Under the unique circumstances of this case, the declaration of defense investigator

16    Patricia de Larios Peyton amply demonstrated a strong possibility that the jury engaged in

17    prejudicial misconduct.  By denying petitioner's request for an evidentiary hearing, the court

18    infringed petitioner's opportunity to develop an adequate factual record for evaluation of the

19    apparent violation of his Sixth Amendment rights.

20    **C.    The trial court abused its discretion by refusing to grant an evidentiary hearing
            to determine if the jury looked up key words in the dictionary during
21            deliberations.**

22        When jurors consult a dictionary on terms used in the court's instructions, it

23    constitutes misconduct which deprives the defendant of his Sixth Amendment rights to

24    confrontation, cross-examination, and the effective assistance of counsel. *United States v.*

25    *Kupau*, 781 F.2d 740, 744 (9th Cir.), *cert. denied*, 479 U.S. 823 (1986); *Gibson v. Clanon*,

26    633 F.2d 851, 854-855 (9th Cir. 1980), *cert. denied*, 450 U.S. 1035 (1981).

27        The jury's use of a dictionary is particularly prejudicial where the term looked up is

28    one which is critical to the issues in dispute, and where the dictionary definition may be

- 50 -

1    different from the one set forth in the jury instructions. For instance, in *Marino v. Vasquez*,

2    *supra*, 812 F.2d at pp. 502-503, 505, the Ninth Circuit upheld habeas relief in a murder case

3    where, among other things, the jury looked up the word "malice" in the dictionary.

4        In this case, two jurors told the defense investigator that they had looked up "a word

5    or words" in the dictionary during deliberations. (Peyton Supp. Decl., ¶¶ 8(b) & 9(b).) A

6    third said that she had gone home at night and looked up "certain words" in the dictionary."

7    (*Id.* ¶ 7(a).) While two of the jurors declined to specify which words they had looked up,

8    Juror 6 believed that the words likely had something to do with premeditation or intent, since

9    these were the concepts which caused the most confusion among the jury. (*Id.* ¶ 9(b).)

10       Petitioner's showing was sufficient to warrant an evidentiary hearing. At a minimum,

11   Peyton's declaration made clear that the jurors made liberal use of a dictionary during

12   deliberations. This alone constituted misconduct – regardless of which specific terms the

13   jurors looked up.

14       Furthermore, petitioner has made a colorable showing that the terms had to do with

15   intent or premeditation – two of the most important concepts in any homicide case. In this

16   case, those concepts carried particular importance, as there was no dispute that petitioner shot

17   Nawabi and the entire case came down to the level of his intent and whether he acted with

18   premeditation. And, as previously discussed, the evidence of such premeditation was

19   extremely weak.

20       The dictionary definitions of *premeditation* differ considerably from the definition

21   given in California's standard jury instructions. The American Heritage Dictionary (2d

22   college ed. 1985) pp. 977-978, gives, as the legal definition of *premeditation*: "The

23   contemplation and plotting of a crime in advance, showing intent to commit the crime." But,

24   under California law, mere intent to commit the crime is not enough to constitute

25   premeditated murder. To the contrary, CALJIC No. 8.20 makes clear that "a mere

26   unconsidered and rash impulse, **even though it includes an intent to kill**, is not deliberation

27   and premeditation as will fix an unlawful killing as murder of the first degree." (emphasis

28   added.)

1    Similarly, the Merriam-Webster Online Dictionary defines *premeditation* as:

2    "consideration or planning of an act beforehand that shows intent to commit that act."    In

3    fact, however CALJIC No. 8.20 requires more than planning and intent.  It requires that the

4    defendant "weigh and consider the question of killing and the reasons for and against such

5    a choice" and act with those consequences in mind.  One could certainly make a rash and

6    unconsidered plan to shoot someone, without having weighed and considered the

7    consequences of that action.

8    Given the seriousness of the jury's misconduct, and the importance of the terms which

9    they looked up in the dictionary, the trial court abused its discretion by failing to order an

10   evidentiary hearing.  Moreover, even if petitioner's showing was insufficient, by itself, to

11   warrant an evidentiary hearing, it had to be considered in conjunction with petitioner's

12   showing that the jury considered facts not in evidence.  As that claim was strong enough to

13   warrant an evidentiary hearing in its own right, there is no reason why that hearing should

14   not also have encompassed the jury's use of a dictionary during deliberations.

## CONCLUSION

16   For all of the foregoing reasons, petitioner Bobby McKenzie respectfully requests that

17   this Court grant the relief requested in the accompanying petition.

18   Dated: July 18, 2008

19                                                Respectfully submitted

20

21                                                SOLOMON WOLLACK
                                                 Specially Appearing for Petitioner
22                                                Bobby Antoine McKenzie

23

24

25

26

27

28

- 52 -